Bryant Gardner, appellee, v. International Paper
Destruction & Recycling, appellant.
___ N.W.2d ___

Filed July 17, 2015.    No. S-14-815.

1. **Workers' Compensation: Appeal and Error.** An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award.

2. ____: ____. On appellate review, the factual findings made by the trial judge of the Workers' Compensation Court have the effect of a jury verdict and will not be disturbed unless clearly wrong.

3. ____: ____. In workers' compensation cases, an appellate court determines questions of law.

4. **Workers' Compensation.** The Nebraska Workers' Compensation Act provides that when an employee suffers personal injury caused by accident or occupational disease, arising out of and in the course of his or her employment, such employee shall receive compensation from his or her employer if the employee was not willfully negligent at the time of receiving such injury.

5. **Workers' Compensation: Proof.** In a proceeding to modify a prior award, the employer has the burden of establishing a decrease of incapacity and the employee has the burden of establishing an increase.

6. **Workers' Compensation: Words and Phrases.** Under Neb. Rev. Stat. § 48-121 (Reissue 2010), a workers' compensation claimant may receive permanent or temporary workers' compensation benefits for either partial or total disability. "Temporary" and "permanent" refer to the duration of disability, while "total" and "partial" refer to the degree or extent of the diminished employability or loss of earning capacity.

7. **Workers' Compensation.** Compensation for temporary disability ceases as soon as the extent of the claimant's permanent disability is ascertained.

8. ____. Temporary disability benefits should be paid only to the time when it becomes apparent that the employee will get no better or no worse because of the injury.

9. ____. When an injured employee has reached maximum medical improvement, any remaining disability is, as a matter of law, permanent.

10. ____. Temporary disability benefits are discontinued at the point of maximum medical improvement, because a disability cannot be both temporary and permanent at the same time.

11. **Actions: Appeal and Error.** The law-of-the-case doctrine reflects the principle that an issue litigated and decided in one stage of a case should not be relitigated at a later stage.

12. **Workers' Compensation: Expert Witnesses: Physicians and Surgeons.** The Workers' Compensation Court is the sole judge of the credibility and weight to be given medical evidence, even when the health care professionals do not give live testimony.

13. **Workers' Compensation.** Causation of an injury or disability presents an issue of fact.

14. ____. Whether a plaintiff in a workers' compensation case is totally and permanently disabled is a question of fact.

15. **Judgments: Appeal and Error.** In testing the sufficiency of the evidence to support the findings of fact, an appellate court considers the evidence in the light most favorable to the successful party, every controverted fact must be resolved in favor of the successful party, and the appellate court gives the successful party the benefit of every inference reasonably deducible from the evidence.

16. **Workers' Compensation: Proof.** A claimant is entitled to an award under the Nebraska Workers' Compensation Act for a work-related injury and disability if the claimant shows, by a preponderance of the evidence, that the claimant sustained an injury and disability proximately caused by an accident which arose out of and in the course of the claimant's employment, even though a preexisting disability or condition has combined with the present work-related injury to produce the disability for which the claimant seeks an award.

17. **Workers' Compensation**. A workers' compensation claimant can recover benefits when an injury, arising out of and in the course of employment, combines with a preexisting condition to produce a disability.

18. **Workers' Compensation: Words and Phrases.** Total disability does not mean a state of absolute helplessness. It means that because of an

injury (1) a worker cannot earn wages in the same kind of work, or work of a similar nature, that he or she was trained for or accustomed to perform or (2) the worker cannot earn wages for work for any other kind of work which a person of his or her mentality and attainments could do.

Appeal from the Workers' Compensation Court: James R. Coe, Judge. Affirmed.

Timothy E. Clarke, of Baylor, Evnen, Curtiss, Grimit & Witt, L.L.P., for appellant.

Richard J. Rensch and Sean P. Rensch, of Rensch & Rensch Law, P.C., L.L.O., for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Miller-Lerman, J.

## NATURE OF CASE

Bryant Gardner, the appellee, suffered an accident arising out of and in the course of his employment on April 16, 2009, while he was employed by the appellant, International Paper Destruction & Recycling (the employer). The Nebraska Workers' Compensation Court filed an "Award" on September 23, 2010, awarding temporary benefits to Gardner. The employer filed a petition to modify the award on May 6, 2013, alleging that Gardner had reached maximum medical improvement and had experienced a decrease in incapacity. In an order filed May 24, the compensation court found that Gardner had reached maximum medical improvement. After a trial on the employer's petition to modify, the compensation court filed a "Further Award" on August 8, 2014, in which the court applied the odd-lot doctrine and determined that, given Gardner's preexisting mental and cognitive deficits, and based upon his physical injuries that arose from the accident, Gardner was permanently and totally disabled. The employer appeals. We affirm.

## STATEMENT OF FACTS

On April 16, 2009, while employed by the employer as a truckdriver, Gardner was operating a semitrailer truck when he was involved in an accident in Omaha, Nebraska. Due to the accident, Gardner was briefly rendered unconscious and suffered injuries to his head, neck, and lower back. Gardner filed a petition in the Workers' Compensation Court on August 27, seeking compensation for his injuries. The employer filed its answer on September 3, generally denying the allegations set forth in Gardner's petition and raising an affirmative defense of willful negligence.

After a trial was held on June 14, 2010, the compensation court filed its "Award" on September 23. The court stated that on April 16, 2009, Gardner was operating a semitrailer truck and that as he was exiting eastbound L Street to merge onto northbound Interstate 680, he failed to negotiate the circular entrance ramp and the semitrailer truck rolled. The court found that Gardner sustained a "'closed head injury'" in the accident of April 16 and that Gardner was unconscious for a brief period of time after the accident.

Gardner saw Dr. Kip Burkman on April 23, 2009. Dr. Burkman noted that Gardner's symptoms included headache, depression, anxiety, blurred vision, dizziness, neck pain, numbness and tingling, confusion, poor balance, and memory loss. The compensation court determined that Gardner's medical history showed that prior to the accident, Gardner had experienced all of the symptoms that Dr. Burkman listed in his report of April 23. The court further determined, based on medical reports, a CT scan of Gardner's head, and an MRI of Gardner's brain, that Gardner did not suffer any physical injury to his brain.

Gardner was seen by a neurologist, Dr. Scott Diesing. In a report dated November 5, 2009, Dr. Diesing noted that an MRI of Gardner's brain on May 6 was normal and that Gardner's neurological examination demonstrated a short-term recall impairment and mild deficits on a short test of mental status. Dr. Diesing noted that Gardner's complaints

were mostly consistent with the musculoskeletal injury as previously diagnosed. Gardner underwent an MRI examination of the cervical spine and the lumbar spine that showed a disk protrusion at the C4-5 and C5-6 levels and, additionally, a slight bulge of the lumbar spine at the S1-L5 level. Dr. Diesing recommended continued symptomatic care.

Gardner continued to complain of neck and back pain, and on November 12, 2009, Dr. Burkman referred him to another physician for a cervical epidural injection, which was performed on November 30. In a report of January 11, 2010, Dr. Diesing noted that Gardner's problems with headaches, nausea, balance, cognitive deficits, and neck pain were improving until the epidural injection on November 30, 2009.

On February 11, 2010, Gardner underwent an MRI examination which, according to Dr. Diesing's report dated April 16, showed that Gardner had a cerebrospinal fluid leak (CSF). The CSF was caused by a leak in the spinal cord's protective sac in which spinal fluid leaked out of a hole in the dura. Gardner underwent a "blood patch" to correct the CSF, as prescribed by Drs. Burkman and Diesing, and Gardner's symptoms improved thereafter. In its award, the compensation court determined that "the evidence preponderates in a finding that the cause of the CSF was due to the epidural injection on November 30, 2009."

Because of Gardner's complaints of cervical and low-back pain, he was referred to Dr. George Greene, a neurosurgeon, and Dr. Eric Phillips, an orthopedic surgeon. In a report dated May 21, 2009, Dr. Phillips stated that Gardner was not a surgical candidate and suggested Gardner continue pain management with Dr. Burkman. In an October 8 report, Dr. Greene likewise did not believe that Gardner was a surgical candidate for neck or back pain.

With respect to Gardner's cognitive injury, Gardner was examined by Dr. Jeffery Snell, a neuropsychologist; Dr. Ty Callahan, a psychologist; Dr. Jennifer Linder, a psychologist; Dr. John Donaldson, a psychiatrist; and Dr. Ian Crabb, a neurologist. In a report dated November 10, 2009, Dr. Linder

stated that Gardner had global impairment in memory and severe cognitive deficits related to memory impairment and was incapable of managing finances and daily tasks.

In a report dated January 27, 2010, Dr. Callahan stated that Gardner suffered from depression and major anxiety disorder and that his emotional state leads to magnification of symptoms sufficient to interfere with his recovery. Dr. Callahan noted that Gardner had suffered a concussion as a result of the April 16, 2009, accident, but that he did not believe any of Gardner's current symptoms were related to any injury to his brain. Dr. Callahan stated that Gardner had reached maximum medical improvement with respect to his cognitive defects within 2 to 3 weeks, or at the most 2 months, after the accident. Dr. Callahan noted Gardner's prior symptoms and stated that he had evidence of malingering based on Gardner's test results. Dr. Callahan stated he believed that the cause of Gardner's cognitive deficits, to the extent they existed, was due to Gardner's previously existing narcotic drug use, marijuana use, and sleep apnea.

Dr. Snell also examined Gardner. In his report and deposition, Dr. Snell stated that based on a CT scan and the "Glasgow coma score," he would not expect any cognitive impairments. Dr. Snell performed various tests on Gardner and suggested that based on Gardner's low test scores, Gardner was not putting forth his full effort on the tests.

Dr. Donaldson examined Gardner, and in a report dated July 2, 2009, Dr. Donaldson stated that there was no objective evidence of physical damage to Gardner's brain. Dr. Donaldson noted that Gardner had some memory loss, and Dr. Donaldson was concerned the cause of the memory loss was Gardner's medications and his sleep apnea. In a July 8 report, Dr. Donaldson stated that Gardner's symptoms were more typical of a concussion because, based on the MRI, there was no sign of brain laceration or significant hemorrhage.

In a report dated October 13, 2009, Dr. Crabb stated that several CT scans showed no traumatic brain injury. Dr. Crabb determined that Gardner had suffered a strained cervical spine

and a low-back strain, that no surgery was indicated, and that Gardner was at maximum medical improvement with no permanent impairment or restrictions. The compensation court's original award mentioned that Dr. Crabb stated that the epidural injection on November 30 was more likely than not the cause of the CSF.

In a report dated June 1, 2010, Dr. Burkman stated that from a brain injury standpoint, Gardner was at maximum medical improvement, but he was still doing active physical therapy, and that therefore, Gardner was not at maximum medical improvement from a physical therapy standpoint.

Based on the evidence, the compensation court set forth its findings in its September 23, 2010, award and stated that

> the evidence preponderates in a finding that [Gardner] was injured in the course and scope of his employment on April 16, 2009, when he was involved in a motor vehicle accident. The evidence preponderates in a finding that [Gardner] suffered a concussion in that accident and as a result had some temporary cognitive deficits that resolved and resulted in no permanent impairment from a cognitive and depression standpoint as a result of the accident and injury of April 16, 2009. The evidence preponderates in a finding that [Gardner's] preexisting conditions were the same from a cognitive standpoint prior to the accident as subsequent to the accident and the exacerbation of the symptoms from the accident of April 16, 2009, was a temporary condition. The evidence preponderates in a finding that the cause of the cognitive deficits was due to the preexisting depression and anxiety from which [Gardner] suffered, the sleep apnea from which [Gardner] suffered and the narcotic and other medications [Gardner] was prescribed prior to the accident.
>
> The Court finds that the evidence preponderates in a finding that [Gardner] sustained an injury to the cervical and lumbar spine and that as a result [Gardner] is still undergoing physical therapy rehabilitation and is not at maximum medical improvement from the injuries

to the cervical and lumbar spine. [Gardner] is at maximum medical improvement regarding any concussion or cognitive aggravation he sustained as a result of the accident of April 16, 2009.

The Court finds that [Gardner] is not at maximum medical improvement, likewise, due to the continuing treatment for the CSF as stated by Dr. Diesing in his report of May 26, 2010.

The compensation court then rejected the employer's affirmative defense of willful negligence.

The compensation court noted the parties stipulated that Gardner's average weekly wage for purposes of temporary total disability was $605.51 per week and that Gardner's average weekly wage for purposes of permanent impairment was $641.60 per week. The court ordered:

The [employer] shall pay to and on behalf of [Gardner] benefits of $403.67 per week from and including April 16, 2009, to and including July 6, 2009, and thereafter and in addition thereto benefits of $282.57 for a 70 percent temporary partial loss of earning capacity from and including July 7, 2009, to and including November 30, 2009, and thereafter and in addition thereto the sum of $403.67 per week from and including December 1, 2009, to and including the date of this hearing on June 14, 2010, and a like amount each week for so long as [Gardner] remains temporarily totally disabled.

The court further ordered that the employer pay certain outstanding medical expenses, that the employer is entitled to a credit for previous payment of medical expenses and indemnity benefits, and that the employer pay certain future medical expenses.

On October 7, 2010, the employer filed an "Application for Review" of the award with the review panel, claiming 17 errors made by the compensation court. Gardner did not appeal or cross-appeal the award. On November 10, 2011, the review panel filed its order in which it affirmed the award of the compensation court. The review panel stated that "there is

ample evidence in the record to support the Court's findings," and it determined that the employer's assigned errors were without merit.

On January 26, 2012, Dr. Phillips performed an MRI examination on Gardner's spine and he compared that MRI to the original MRI of May 6, 2009. Based on the January 2012 MRI, Dr. Phillips recommended surgery. On July 27, Gardner underwent surgery performed by Dr. Phillips for an anterior cervical diskectomy and a three-level fusion from the C-4 level to the C-7 level.

On May 6, 2013, the employer filed its petition to modify the award, alleging that Gardner had reached maximum medical improvement and had experienced a decrease in incapacity. In his answer filed May 21, Gardner generally denied the employer's petition to modify. Gardner stated that he had not reached maximum medical improvement, had not experienced a decrease in incapacity, "and may have experienced an increase in incapacity due solely to his original injury."

On May 13, 2013, the employer filed a motion to compel requesting the court to order Gardner to appear for a functional capacity evaluation at the location recommended by Dr. Phillips. On May 24, the compensation court filed an order recognizing that there was a dispute between the parties regarding who should provide a functional capacity evaluation to Gardner "now that [Gardner] has reached maximum medical improvement." The court ordered that Gardner should receive the functional capacity evaluation pursuant to Dr. Phillips' recommendation.

Gardner completed a functional capacity evaluation on July 15, 2013. The functional capacity evaluation found that Gardner could work at a "medium physical demand" level with lifting restrictions of 30 pounds shoulder level, 25 pounds overhead, and a two-hand carry of 40 pounds.

On September 11, 2013, Dr. Phillips responded to a letter from the employer's counsel in which Dr. Phillips stated that Gardner had reached maximum medical improvement with regard to his work-related injury.

On September 25, 2013, the compensation court filed an order appointing vocational rehabilitation counselor, Patricia Reilly, to perform an evaluation for vocation rehabilitation services for Gardner in addition to performing a loss of earning capacity evaluation. On October 18, the employer filed a motion in limine to exclude an October 10 report of Dr. Jay Rich, a psychiatrist, from being considered in Gardner's loss of earning capacity evaluation. In the October 10 report, Dr. Rich was asked, "Do you believe the truck accident was a (not the one and only) proximate cause of . . . Gardner's depression and post-traumatic stress disorder?" (Emphasis in original.) Dr. Rich answered, "[Gardner] had no history of depression or post traumatic stress prior to the accident." In its motion in limine, the employer argued that because the compensation court had determined in its initial award that Gardner had reached maximum medical improvement with respect to his mental health, any ongoing problems are related to his preexisting condition and not related to the compensable injury. The employer thus argued Dr. Rich's report should not be considered in Gardner's loss of earning capacity evaluation.

In an order filed October 31, 2013, the compensation court granted Gardner leave to provide a further report from Dr. Rich to the vocational rehabilitation counselor, Reilly, "concerning any further opinions that Dr. Rich may have upon [Gardner's] mental condition and/or restrictions, if any." The court also granted leave to the employer to take further discovery depositions and to rebut the opinion of Dr. Rich with an updated report of the psychiatrist of the employer's choice. The order also stated the parties stipulated that the employer

> shall pay to [Gardner] indemnity at the rate of a 45 percent loss of earning capacity to the time of final resolution and that the finding of the 45 percent loss of earning capacity shall be considered an agreement by the parties with approval by the Nebraska Workers' Compensation Court.

Dr. Rich treated Gardner four times between August 29 and October 30, 2013. In his August 29 report, Dr. Rich stated that Gardner was depressed and suffered from posttraumatic stress disorder and he noted that Gardner had "no psychiatric treatment history." In a December 16 report addressed to Gardner's attorney, Dr. Rich stated that "Gardner's pre-existing cognitive defects and depression were aggravated by the rollover." He further stated that he believed Gardner's "defects are permanent" and that "Gardner's current symptoms restrict him from return[ing] to work at this time."

In a "Clarification Report" dated February 13, 2014, Dr. Rich stated that (1) Gardner suffered preexisting mental and cognitive deficits, including depression, anxiety, sleep apnea, and effects of narcotics and other medications; (2) the April 16, 2009, accident caused only a temporary exacerbation of the cognitive preexisting conditions; (3) following the temporary exacerbation, Gardner's cognitive state returned to the preexisting conditions he was suffering prior to the accident; (4) the preexisting cognitive conditions, along with the pain caused by the accident, limited Gardner's ability to return to full-time work; (5) Gardner's preexisting cognitive conditions were dynamic and naturally progressive mental states that were left untreated and that they "naturally progressed and expectedly intensified"; and (6) Gardner's preexisting cognitive conditions were permanent and "were naturally progressing due to . . . Gardner's lack of treatment — not due to the April 16, 2009 rollover."

In Reilly's first loss of earning capacity analysis dated October 3, 2013, Reilly determined that Gardner sustained a loss of earning power of approximately 45 percent. The scope of Reilly's first analysis included only Gardner's physical restrictions; it did not include his preexisting cognitive deficits.

In Reilly's addendum to the loss of earning power analysis dated January 10, 2014, Reilly considered Gardner's preexisting cognitive deficits by relying upon the reports of Dr. Rich. Reilly stated that "[w]ith consideration given to the opinions

of Dr. Jay Rich . . . Gardner would be considered to fit the definition of 'odd-lot doctrine' and therefore would not be able to maintain regular full-time employment and would be considered permanently and totally disabled."

In Reilly's second addendum to the loss of earning power analysis dated April 25, 2014, Reilly provided two alternative loss of earning capacity opinions that were based on two hypothetical scenarios presented by the parties' attorneys. Based on the scenario set forth by the employer, which posited that Gardner had no neurocognitive or psychological impairment, Reilly determined that "Gardner would not sustain a loss of earning power as a result of the rollover accident." In contrast, based on the scenario set forth by Gardner, which posited that Gardner had preexisting cognitive and mental conditions that were progressing due to lack of treatment, Reilly determined that because of the combined effect of the preexisting cognitive issues along with the orthopedic injury, "Gardner would be considered to fit the definition of 'odd-lot doctrine' and therefore would not be able to maintain regular full-time employment and would be considered permanently and totally disabled."

On April 28, 2014, a trial was held on the employer's petition to modify. At the trial, the employer objected to, inter alia, Gardner's offer of the report of Dr. Rich, described above, and a separate report of Dr. Jan Golnick. In a report dated March 25, 2013, Dr. Golnick stated that Gardner suffered chronic headaches following the April 16, 2009, accident and that since the accident, Gardner has experienced dizziness, cognitive and memory problems, and regular episodes of confusion. Dr. Golnick reported that Gardner had experienced depression and moderate to severe anxiety. The only past medical history reported by Dr. Golnick was as follows: sinus and nasal surgery in 2005; anterior cervical fusion, C4-C7 level, by Dr. Phillips on July 12, 2012; hypertension; and sleep apnea. Dr. Golnick stated he would like to schedule a followup appointment with Gardner due to the complexity of his case and "due to the fact that I [Dr. Golnick] need to learn more

about him from his medical records before making more definite recommendations."

In objecting to the reports at trial, the employer's attorney argued that the reports of Drs. Rich and Golnick

> are all dealing with issues related to depression, the traumatic brain injury, the effect of that. And we believe that that information is not relevant to the proceeding today because the Court has already issued a decision regarding the depression and the traumatic brain injury and said that that healed without impairment or restriction. And this is essentially an attempt to modify, when that's not appropriate, because the law of the case says that that's already been decided. It's essentially a relevance objection, Your Honor.

In response, Gardner's attorney asserted that

> when you do a loss of earning capacity, you do the loss of earning capacity with respect to the injury that . . . was precipitated as a result of the work injury, and then you take the person as whole. What does that person bring to the table at the time that she was injured?

Gardner's attorney further stated that

> it is our position, when we're doing the loss of earning capacity, that the Court must consider, not only the injuries that [Gardner] sustained at the time of the work injury, but his — what he brought to the table at the time that he was injured. What were his preexisting conditions that could affect his ability to earn a living?

The court overruled the employer's objection and received the reports of Drs. Rich and Golnick.

On August 8, 2014, the compensation court filed its "Further Award" from which this appeal is taken. In sum, the compensation court applied the odd-lot doctrine, which generally provides that while a worker is not altogether incapacitated for work, the worker is so handicapped that the worker will not be employed regularly in any well-known branch of the labor market, and the compensation court determined that Gardner was permanently and totally disabled. See *Schlup v.*

*Auburn Needleworks*, 239 Neb. 854, 479 N.W.2d 440 (1992). Specifically, in the further award, the court determined that the necessity for the diskectomy and the three-level cervical fusion performed by Dr. Phillips was a result of the April 16, 2009, accident. Based upon the medical evidence and the loss of earning capacity reports from Reilly, the court further determined that Gardner was permanently and totally disabled. The court recognized that in its initial award, it had stated that Gardner's preexisting cognitive deficits were temporarily aggravated by the accident and that they "resolved to their prior state and resulted in no permanent impairment as a result of the work related accident of April 16, 2009." The court further stated:

> Having found that [Gardner's] preexisting emotional condition returned to its pre-accident state, [Gardner's] emotional condition prior to the accident did not resolve. The Court finds that as a result of the [CSF] and the permanent impairment from the three-level cervical fusion with continuing pain combined with [Gardner's] prior emotional and mental state involving learning disability, depression, anxiety and cognitive impairment all developed to make [Gardner] permanently and totally disabled pursuant to the loss of earning capacity analysis of the vocational rehabilitation expert . . . Reilly.

The court also noted that "[s]everal of [Gardner's] physicians have found that [Gardner] will be in need of future medical care such as Dr. Rich stated for pain management and [Gardner's] depression, anxiety, and cognitive difficulties."

In the further award, as modified by an order nunc pro tunc filed August 15, 2014, the court ordered that the employer

> shall pay to and on behalf of [Gardner] the sums for temporary total disability and temporary partial disability for those periods of time and amounts as set forth in the Award of September 23, 2010, and the Order of October 31, 2013 to and including the date of the filing of this Further Order and thereafter in addition thereto the [employer] shall pay to and on behalf of [Gardner]

the sum of [$427.73] per week for so long as [Gardner] remains permanently and totally disabled.

The court further ordered that the employer pay Gardner certain outstanding medical expenses and that the employer is entitled to a credit for previous payments of medical expenses and indemnity. The court also stated that the employer "should continue to provide and pay for such reasonable and necessary medical expenses as may be necessary as a result of the accident and injury of April 16, 2009."

The employer appeals.

## ASSIGNMENTS OF ERROR

The employer generally assigns, restated, that the compensation court erred when it found that Gardner was permanently and totally disabled and entered the further award accordingly. In particular, the employer contends that because the original award found that Gardner's mental health issues had reached maximum medical improvement, no further awards or evidence regarding mental health issues were appropriate. Thus, the employer claims that the compensation court erred when it considered Gardner's mental and cognitive deficits, admitted reports of Drs. Rich and Golnick, and awarded future medical care including treatment for Gardner's mental health.

## STANDARDS OF REVIEW

[1] An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. See Neb. Rev. Stat. § 48-185 (Cum. Supp. 2014).

[2,3] On appellate review, the factual findings made by the trial judge of the Workers' Compensation Court have the

effect of a jury verdict and will not be disturbed unless clearly wrong. *Armstrong v. State*, 290 Neb. 205, 859 N.W.2d 541 (2015). In workers' compensation cases, we determine questions of law. *Id*.

## ANALYSIS

The employer generally claims that the compensation court erred when it found that Gardner was permanently and totally disabled. The employer asserts that in its original award, the compensation court found that Gardner had reached maximum medical improvement with respect to his head and mental injuries resulting from the April 16, 2009, accident and that this finding was the "law of the case," thus precluding consideration of subsequent mental health issues in the proceedings resulting in the further award. Specifically, the employer claims the compensation court erred when it considered Gardner's preexisting mental health issues and admitted medical reports which discussed Gardner's subsequent mental condition. We find no merit to these arguments and determine that the compensation court did not err when it found that Gardner was permanently and totally disabled.

*Applicable Law.*

[4] The Nebraska Workers' Compensation Act provides that when an employee suffers personal injury caused by accident or occupational disease, arising out of and in the course of his or her employment, such employee shall receive compensation from his or her employer if the employee was not willfully negligent at the time of receiving such injury. Neb. Rev. Stat. § 48-101 (Reissue 2010).

With respect to the modification of awards in workers' compensation cases, Neb. Rev. Stat. § 48-141 (Reissue 2010) provides:

> All amounts paid by an employer or by an insurance company carrying such risk, as the case may be, and received by the employee or his or her dependents by lump-sum payments pursuant to section 48-139 shall be final and not subject to readjustment if the lump-sum

settlement is in conformity with the Nebraska Workers' Compensation Act, unless the settlement is procured by fraud, but the amount of any agreement or award payable periodically may be modified as follows: (1) At any time by agreement of the parties with approval of the Nebraska Workers' Compensation Court; or (2) if the parties cannot agree, then at any time after six months from the date of the agreement or award, an application may be made by either party on the ground of increase or decrease of incapacity due solely to the injury . . . .

It is well recognized with respect to modification of awards that "[a]t the administrative level, awards can be reopened by the compensation board for modification to meet changes in claimant's condition, such as increase, decrease, or termination of disability." 13 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law, ch. 131 at 131-1 (2015). It has been further stated:

In all states, some kind of provision is made for reopening and modifying awards. This provision is a recognition of the obvious fact that, no matter how competent a commission's diagnosis of claimant's condition and earning prospects at the time of hearing may be, that condition may later change markedly for the worse, or may improve, or may even clear up altogether. Under the typical award in the form of periodic payments during a specified maximum period or during disability, the objectives of the legislation are best accomplished if the commission can increase, decrease, revive, or terminate payments to correspond to a claimant's changed condition.

*Id.*, § 131.01 at 131-3.

[5] In a proceeding to modify a prior award, the employer has the burden of establishing a decrease of incapacity and the employee has the burden of establishing an increase. *Visoso v. Cargill Meat Solutions*, 285 Neb. 272, 826 N.W.2d 845 (2013). We have stated that the employee has the burden of proving that his injury caused permanent impairment as a

predicate to an award for permanent disability, i.e., loss of earning capacity. See *id*. See, also, *Green v. Drivers Mgmt., Inc.*, 263 Neb. 197, 639 N.W.2d 94 (2002).

[6-9] Under Neb. Rev. Stat. § 48-121 (Reissue 2010), a workers' compensation claimant may receive permanent or temporary workers' compensation benefits for either partial or total disability. "Temporary" and "permanent" refer to the duration of disability, while "total" and "partial" refer to the degree or extent of the diminished employability or loss of earning capacity. *Rodriguez v. Hirschbach Motor Lines*, 270 Neb. 757, 707 N.W.2d 232 (2005). Compensation for temporary disability ceases as soon as the extent of the claimant's permanent disability is ascertained. *Id*. In other words, temporary disability benefits should be paid only to the time when it becomes apparent that the employee will get no better or no worse because of the injury. *Visoso v. Cargill Meat Solutions, supra*; *Rodriguez v. Hirschbach Motor Lines, supra*. Simply stated, when an injured employee has reached maximum medical improvement, any remaining disability is, as a matter of law, permanent. *Id*.

[10] We have stated that temporary disability benefits are discontinued at the point of maximum medical improvement, because a disability cannot be both temporary and permanent at the same time. *Visoso v. Cargill Meat Solutions, supra*. Temporary payments do not continue after maximum medical improvement has been reached by the employee, as to all injuries. See *Rodriguez v. Hirschbach Motor Lines, supra*. And once the employer establishes that the employee has reached maximum medical improvement, the employer has satisfied its burden of proof that the employee's temporary disability payments should cease. See *Visoso v. Cargill Meat Solutions, supra.*

After determining that temporary disability payments should cease, the next question is what, if any, permanent disability payments the employer should pay to the employee. See *id*. Permanent disability is an essential element of an employee's claim in workers' compensation, and therefore, the burden

rests with the employee to prove the elements of his or her compensation claim. *Id*. See, also, *Green v. Drivers Mgmt., Inc., supra*. After reaching maximum medical improvement, the employee has the burden of proving that his or her injury caused permanent impairment and that this permanent impairment resulted in a loss of earning capacity. See *Visoso v. Cargill Meat Solutions, supra*.

*Employer's Petition to Modify and Further Award.*

In this case, the compensation court awarded temporary benefits to Gardner in the original award filed September 23, 2010. On May 6, 2013, the employer filed a petition to modify the original award, alleging that Gardner had reached maximum medical improvement as to all of his injuries and had experienced a decrease in his incapacity. In his answer filed May 21, Gardner alleged that he had not reached maximum medical improvement, that he had not experienced a decrease in incapacity, and that he "may have experienced an increase in incapacity due solely to his original injury." Gardner suggests that a petition to modify may not have been appropriate. However, because the original award did not set forth terms to convert from temporary to permanent benefits and the parties did not agree to convert, we reject this suggestion. Compare, *Weber v. Gas 'N Shop*, 280 Neb. 296, 786 N.W.2d 671 (2010); *Davis v. Crete Carrier Corp.*, 274 Neb. 362, 740 N.W.2d 598 (2007).

With respect to when Gardner reached maximum medical improvement, the record shows that on May 24, 2013, the compensation court filed an order in which it stated that Gardner "has reached maximum medical improvement" and that he should receive a functional capacity evaluation pursuant to Dr. Phillips' recommendation. Furthermore, in an August 20 letter, the employer's counsel asked Dr. Phillips whether Gardner had reached maximum medical improvement, and in a September 11 response, Dr. Phillips stated that Gardner had reached maximum medical improvement. We

note for completeness that in an order filed on October 31, the compensation court recognized, inter alia, that the parties had stipulated that the employer

shall pay to [Gardner] indemnity at the rate of a 45 percent loss of earning capacity to the time of final resolution and that the finding of the 45 percent loss of earning capacity shall be considered an agreement by the parties with approval by the Nebraska Workers' Compensation Court.

Because it was established that Gardner had reached maximum medical improvement, Gardner had the burden of proving that his injury caused permanent impairment and that this permanent impairment resulted in a loss of earning capacity. See *Visoso v. Cargill Meat Solutions*, 285 Neb. 272, 826 N.W.2d 845 (2013). After trial, the compensation court filed its further award on August 8, 2014, in which the court determined that Gardner's injury had caused permanent impairment and that his permanent impairment resulted in a 100-percent loss of earning capacity. The compensation court thus awarded Gardner permanent total disability benefits.

*Employer's Contentions.*

The employer claims that the compensation court erred in its further award, because the court considered Gardner's preexisting mental and cognitive conditions and admitted and relied upon the reports of Drs. Rich and Golnick, which reports discussed Gardner's mental and cognitive conditions. The employer asserts that such consideration violates the law-of-the-case doctrine. The employer acknowledges that in the original award, the court had determined that Gardner had preexisting mental health problems that were temporarily exacerbated by the April 16, 2009, accident, but the employer focuses on the ruling to the effect that the head and mental injuries resulting from the accident had reached maximum medical improvement. In the current proceeding, the employer argues that given the finding of maximum medical improvement of mental health issues in the original award, the court

improperly considered Gardner's mental and cognitive conditions and the medical reports that discuss such conditions in determining the extent of Gardner's disability in the further award. In response, Gardner notes that in the original award, the Workers' Compensation Court found that Gardner had a preexisting mental condition and that Gardner's mental and emotional deficits had returned to the baseline preexisting level. Gardner contends that the enduring fact for law-of-the-case purposes is that Gardner has a preexisting mental health condition.

[11] We have stated that the law-of-the-case doctrine reflects the principle that an issue litigated and decided in one stage of a case should not be relitigated at a later stage. *In re 2007 Appropriations of Niobrara River Waters*, 283 Neb. 629, 820 N.W.2d 44 (2012). With respect to the law-of-the-case doctrine in workers' compensation cases, it has been stated:

> [In a] [c]hange-of-condition reopening proceeding, the issue before the [compensation court] is sharply restricted to the question of extent of improvement or worsening of the injury on which the original award was based. If the original award held that there was no connection between the accident and claimant's permanent disability, there is nothing to reopen, and claimant cannot retry the issue of work-connection through the device of a reopening petition. Conversely, when the employee reopens to show increased disability, the insurance carrier cannot raise the basic issue of liability. In short, no matter who brings the reopening proceeding, neither party can raise original issues such as work-connection, employee or employer status, occurrence of a compensable accident, and degree of disability at the time of the first award.

13 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 131.03[2][b] at 131-35 (2015). The authority just quoted illustrates the types of determinations in a workers' compensation case that are subject to the law-of-the-case doctrine. We have effectively applied the concept of law of the case in workers' compensation cases. E.g., *Starks*

*v. Cornhusker Packing Co.*, 254 Neb. 30, 37-38, 573 N.W.2d 757, 763 (1998) (stating in modification proceeding that modification of original award could not be applied retroactively to date of original award because "a modification award, retroactively applied to the date of the original award, would effectively afford the parties involved an opportunity to relitigate the award. Such action is prohibited by the principle of res judicata").

In the present case, in the original award, the compensation court found that Gardner had preexisting mental and cognitive deficits prior to the April 16, 2009, accident, including depression, anxiety, confusion, and memory loss. The court determined that these preexisting mental and cognitive deficits were temporarily aggravated by the injury to the head in the accident, but that after the aggravation subsided, Gardner's mental and cognitive deficits returned to their prior baseline condition. The court stated that "[t]he evidence preponderates in a finding that [Gardner's] preexisting conditions were the same from a cognitive standpoint prior to the accident as subsequent to the accident and that the exacerbation of the symptoms from the accident of April 16, 2009, was a temporary condition."

The fact that Gardner had preexisting mental and cognitive deficits that remained after being temporarily exacerbated by the accident, as found in the original award, became a fact decided in this case from which no appeal was taken. Given the fact that Gardner had been determined to have a preexisting mental health condition, under the law-of-the-case doctrine, the compensation court could and did properly consider the significance of the preexisting condition in rendering its further award. In this regard, the compensation court stated in the further award:

The Award of September 23, 2010 acknowledged [Gardner's] preexisting cognitive, depression and anxiety deficits and found that the accident of April 16, 2009 resulted in a temporary aggravation that resolved to their prior state and resulted in no permanent impairment as

a result of the work related accident of April 16, 2009. Having found that [Gardner's] preexisting emotional condition returned to its pre-accident state, [Gardner's] emotional condition prior to the accident did not resolve.

[12] As a further argument regarding Gardner's mental health issue, the employer contends that the reports of Drs. Rich and Golnick should not have been considered. We do not agree. The reports of Drs. Rich and Golnick were relevant to the issue of Gardner's mental health condition as it related to his disability at the time of consideration of the petition to modify. In this case, the Workers' Compensation Court did not make a separate award for mental illness. Compare *Manchester v. Drivers Mgmt.*, 278 Neb. 776, 775 N.W.2d 179 (2009). Nevertheless, mental health evidence was relevant to the issue of permanent disability. In Dr. Rich's reports, he noted that Gardner suffered from depression, anxiety, and posttraumatic stress disorder, which limited his ability to work. In Dr. Golnick's report, he noted that Gardner experienced depression, dizziness, cognitive and memory problems, regular episodes of confusion, and moderate to severe anxiety. These symptoms, as well as Gardner's reported "difficulty with word finding," bore on Gardner's employability. The Workers' Compensation Court is the sole judge of the credibility and weight to be given medical evidence, even when the health care professionals do not give live testimony. See *Damme v. Pike Enters.*, 289 Neb. 620, 856 N.W.2d 422 (2014). The compensation court did not err when it admitted and considered the reports of Drs. Rich and Golnick.

[13-15] The employer claims generally that the compensation court erred when it found Gardner was permanently and totally disabled. We find no merit to this assignment of error. Causation of an injury or disability presents an issue of fact. *Damme v. Pike Enters., supra*. Whether a plaintiff in a workers' compensation case is totally and permanently disabled is a question of fact. See, *Armstrong v. State*, 290 Neb. 205, 859 N.W.2d 541 (2015); *Money v. Tyrrell Flowers*, 275 Neb. 602, 748 N.W.2d 49 (2008). In testing the sufficiency of the

evidence to support the findings of fact, an appellate court considers the evidence in the light most favorable to the successful party, every controverted fact must be resolved in favor of the successful party, and we give the successful party the benefit of every inference reasonably deducible from the evidence. See *Money v. Tyrrell Flowers*, *supra*.

[16,17] With respect to preexisting conditions, we have stated that a claimant is entitled to an award under the Nebraska Workers' Compensation Act for a work-related injury and disability if the claimant shows, by a preponderance of the evidence, that the claimant sustained an injury and disability proximately caused by an accident which arose out of and in the course of the claimant's employment, even though a preexisting disability or condition has combined with the present work-related injury to produce the disability for which the claimant seeks an award. *Schlup v. Auburn Needleworks*, 239 Neb. 854, 479 N.W.2d 440 (1992). See, also, *Damme v. Pike Enters., supra*. A workers' compensation claimant can recover benefits when an injury, arising out of and in the course of employment, combines with a preexisting condition to produce a disability. See *Damme v. Pike Enters., supra*.

Although a South Carolina Court of Appeals' case involved issues regarding a separate award for mental illness, we agree with the observation of that court, which stated that "[a mental health] symptom which is present and causally connected, but found not to impact upon the claimant's condition at the time of the original award, may later manifest itself in full bloom and thereby worsen his or her condition." *Estridge v. Joslyn Clark Controls, Inc.*, 325 S.C. 532, 540, 482 S.E.2d 577, 581 (S.C. App. 1997). Thus, the worsening of a claimant's mental health over time remains a possibility.

In the present case, the Workers' Compensation Court relied on the odd-lot doctrine. In *Schlup*, we considered the odd-lot doctrine and agreed with the Workers' Compensation Court that the claimant was permanently and totally disabled under the odd-lot doctrine. We quoted Professor Larson and stated that "'[u]nder the odd-lot doctrine, which is accepted

in virtually every jurisdiction, total disability may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market.' 2 A. Larson, The Law of Workmen's Compensation § 57.51(a) at 10-164.68 (1989)." *Schlup v. Auburn Needleworks*, 239 Neb. at 865, 479 N.W.2d at 448. See 7 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 83.01 (2015). We further quoted Professor Larson by stating:

"A considerable number of the odd-lot cases involve claimants whose adaptability to the new situation created by their physical injury was constricted by lack of mental capacity or education. This is a sensible result, since it is a matter of common observation that a man whose sole stock in trade has been the capacity to perform physical movements, and whose ability to make those movements has been impaired by injury, is under a severe disadvantage in acquiring a dependable new means of livelihood . . . ."

*Schlup v. Auburn Needleworks*, 239 Neb. at 865, 479 N.W.2d at 448. See 7 Larson & Larson, *supra*, § 83.04.

In *Schlup*, the claimant suffered from carpal tunnel syndrome arising out of her employment and she filed a claim in the Workers' Compensation Court. We noted that the claimant had preexisting problems with her back and that she had left high school in 10th grade and had not received a diploma through the general educational development program. We recognized that because of her preexisting back problems and academic shortcomings, it was impossible for her to find work that did not involve the use of her hands. We determined that in assessing her work-related injury, the compensation court did not err when it considered evidence of her preexisting back problems and academic shortcomings.

[18] With respect to total and permanent disability, we recently stated that total disability does not mean a state of absolute helplessness. *Armstrong v. State*, 290 Neb. 205, 859 N.W.2d 541 (2015). See, also, *Schlup v. Auburn Needleworks,*

*supra*. It means that because of an injury (1) a worker cannot earn wages in the same kind of work, or work of a similar nature, that he or she was trained for or accustomed to perform or (2) the worker cannot earn wages for work for any other kind of work which a person of his or her mentality and attainments could do. *Id*.

In the present case, the Workers' Compensation Court found that Gardner had reached maximum medical improvement with respect to all of his injuries arising out of the April 16, 2009, accident. Relying upon the previous finding of his "pre-accident cognitive and learning disability, depression and anxiety," the evidence properly admitted at trial, and applying the odd-lot doctrine, the compensation court determined that Gardner's injury resulting from the accident had combined with his preexisting mental and cognitive conditions and that Gardner was permanently and totally disabled. Included in the evidence upon which the compensation court relied was a report from Dr. Golnick dated March 25, 2013, which stated that since Gardner underwent the three-level cervical fusion of his spine, Gardner continued to have headaches and neck pain, and that he "report[ed] periods of confusion and difficulty with word finding." The compensation court also noted a December 16 report by Dr. Rich, which stated that Gardner had preexisting cognitive deficits and depression prior to the accident and that Gardner "limits his physical activity based on his pain which restricts [Gardner's] interactions and limits other activity and social involvements based on his anxiety and depression." Importantly, Dr. Rich stated that Gardner's restrictions continued to cause an inability to work. Dr. Rich stated that Gardner's preexisting cognitive conditions were permanent and "were naturally progressing due to . . . Gardner's lack of treatment." Under the odd-lot doctrine, the court could look to Gardner's physical injury resulting from the accident along with his preexisting mental and cognitive conditions, including depression and anxiety, in order to determine the extent of his loss of earning power. In view of the evidence and applicable law, we determine that

the court did not err when it determined that Gardner was permanently and totally disabled.

We note for completeness that the employer also claims that the compensation court erred when it awarded Gardner future medical care for his depression, anxiety, and cognitive deficits. However, our reading of the further award does not show the specific award about which the employer complains and we reject this assignment of error.

According to the further award, the employer "should continue to provide and pay for such reasonable and necessary medical expenses as may be necessary as a result of the accident and injury of April 16, 2009." In paragraph III of the further award, the compensation court stated: "Several of [Gardner's] physicians have found that [Gardner] will be in need of future medical care such as Dr. Rich stated for pain management and [Gardner's] depression, anxiety, and cognitive difficulties." In paragraph IV of the further award, the court stated that the employer

> should pay to and on behalf of [Gardner] any outstanding medical bills set forth in Exhibit 237. The defendant is entitled to a credit for any previous payment of medical bills as itemized in Exhibits 267 and 268. To the extent that there are any other third-party payees or reimbursements to [Gardner] those payments should be made as indicated. In addition, the medical fees shall be paid pursuant to the medical fee schedule as adopted by the Nebraska Workers' Compensation Court.

In paragraph V of the further award, the court stated that the employer "is entitled to a credit for its previous payment of indemnity and medical expenses as set forth in Exhibit 267."

The further award also provided that the employer "shall pay to and on behalf of [Gardner] the outstanding medical expenses set forth more particularly in paragraph IV above and subject to the terms and conditions of that paragraph." The order provided that the employer "is entitled to a credit for its previous payment of indemnity and medical expenses as set forth more particularly in paragraphs IV and V above."

Taken as a whole, the court did not make a specific order finding a mental health injury or specifically regarding future medical care for Gardner's mental health issues. We find no error in the further award.

## CONCLUSION

As explained above, we determine that the compensation court did not err when it admitted and relied upon the reports of Drs. Rich and Golnick and when it considered Gardner's preexisting mental and cognitive deficits in determining the extent of his disability. We further determine that the compensation court did not err when it applied the odd-lot doctrine and found that Gardner was permanently and totally disabled. Accordingly, we affirm the further award of the compensation court.

AFFIRMED.