IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

JURGENSON V. INTERNATIONAL PAPER CO.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

CHAUNTELLE JURGENSON, APPELLEE,

V.

INTERNATIONAL PAPER COMPANY, APPELLANT.

Filed August 1, 2017.    No. A-16-1069.

Appeal from the Workers' Compensation Court: JAMES R. COE, Judge. Affirmed.

Timothy E. Clarke and Thomas B. Shires, of Baylor, Evnen, Curtiss, Grimit, & Witt, L.L.P., for appellant.

Jeffrey F. Putnam, of Law Offices of Jeffrey F. Putnam, P.C., L.L.O., for appellee.

INBODY, PIRTLE, and RIEDMANN, Judges.

RIEDMANN, Judge.

## I. INTRODUCTION

International Paper Company (IPC) appeals from an award of the Workers' Compensation Court determining that Chauntelle Jurgenson had suffered an injury to her body as a whole in the course of her employment and awarding her temporary and permanent disability benefits. For the reasons that follow, we affirm.

## II. BACKGROUND

Jurgenson was employed at IPC as an assistant machine operator. While working on May 21, 2008, an 80- to 100-pound die board fell onto her right foot. Despite the fact that she was wearing steel-toed boots, the knives on the die board penetrated her boot. Immediately following

- 1 -

this incident, Jurgenson assessed the damage to her foot but continued working for the remainder of the day.

The following day, she informed her employer of what had happened and sought medical treatment. At that time, Jurgenson's foot was very painful with swelling and bruising. IPC took her to CompChoice, where a physician examined her foot, wrapped it, and sent her back to work on light duty. The light duty restrictions were removed the next day.

Jurgenson continued to experience pain in her foot following her visit to CompChoice. She next sought medical attention approximately two months later, on or around August 27, 2008, after her foot gave out and her employer took her back to CompChoice. Jurgenson testified that although her foot had been painful ever since the incident in May, she did not seek treatment sooner because she could not afford it. The physician at CompChoice referred Jurgenson to her primary care doctor, Dr. Ed Mantler.

Following her visit with Dr. Mantler, Jurgenson was referred to several other physicians who recommended and performed two surgeries on her foot, in September 2008 and January 2009. Jurgenson testified that neither surgery alleviated her symptoms.

A representative for IPC sent Jurgenson to Dr. Michael O'Neil in April 2009. After an examination, Dr. O'Neil diagnosed her with complex regional pain syndrome in her right foot as a result of her work injury and recommended that she undergo sympathetic nerve blocks, which she did. Jurgenson testified that these blocks did not help her symptoms.

Jurgenson then met with a different physician for ongoing treatment and pain management. This physician prescribed medication, first methadone and later Suboxone, to alleviate her symptoms. Jurgenson was on medication for the following five years. She stated that the medication helped her sleep at night, but her symptoms were unchanged. During this time, her foot continued to be sensitive and she had difficulty with everyday tasks such as showering, walking, wearing certain shoes and socks, and lying under bed sheets. Jurgenson said that she could only walk two to three blocks at a time before her foot would become so sore and tender that she would need to take a break. She testified that her foot was sensitive on the top and side and that it mottled. While the sensitivity did not spread up her leg, Jurgenson said that there was numbness and her leg would ache.

In June 2010, Jurgenson underwent a functional capacity evaluation. The physical therapist who administered the evaluation found that Jurgenson was able to work at a light to medium physical demand level. He also noted that "Jurgenson's findings were not always consistent with anatomical and physiological principles" and that she had passed 39 percent of the validity criteria, "indicating very poor effort and invalid test results that appear to represent a minimal level of functional ability." At trial, Jurgenson testified that she had made a good effort during that evaluation but she had struggled with it because her foot was sore and she was not having a "good" day.

Dr. O'Neil examined Jurgenson a second time in June 2010. In a report dated June 24, Dr. O'Neil opined that she had reached maximum medical improvement. He found that Jurgenson had a 25-percent permanent physical impairment to her right lower extremity, which translated to a 10-percent permanent impairment of the whole body. Dr. O'Neil opined that Jurgenson would not be capable of work involving prolonged periods of standing, walking, or climbing due to her complex regional pain syndrome.

Jurgenson testified that she continued taking Suboxone for the next several years even though her symptoms remained the same. In February 2014, she saw a physician who suggested she cease taking the medication and who referred her to Dr. Griffith Evans to discuss the possibility of a spinal cord stimulator. Jurgenson began treatment with Dr. Evans on September 30. After determining that Jurgenson would be a good candidate for a spinal cord stimulator trial, Dr. Evans implanted two spinal cord stimulator leads in November. Jurgenson experienced relief after the implantation of leads. Dr. Evans implanted a permanent spinal cord stimulator on December 2.

Following the implantation of the stimulator, Jurgenson testified that her symptoms and pain decreased, although she still had some ongoing symptoms, including bothered nerves between her toes, difficulty lying under the bed sheets, and difficulty walking on "bad" days. Jurgenson saw an associate of Dr. Evans on March 23, 2015 for a follow-up examination after the implantation procedure. At that time, Jurgenson reported that she had experienced 50- to 75-percent pain relief, she was no longer taking Suboxone, and her overall function had noticeably improved. Nonetheless, Dr. Evans opined that Jurgenson should be restricted from "rigorous physical activity with extension of her arms well over her head repeatedly" as such movements could cause lead migration requiring lead revision.

In October 2015, Jurgenson underwent an examination by Dr. D.M. Gammel at the request of her attorney. Dr. Gammel found that she had complex regional pain syndrome of her right lower extremity and 25-percent impairment of that extremity. In his report, Dr. Gammel stated that he agreed with the restrictions placed on Jurgenson by Dr. Evans, including a restriction on repetitive or vigorous lifting or hand raising above her head, as well as avoiding lifting and twisting.

Karen Stricklett conducted a loss of earning capacity analysis for Jurgenson in 2015 and provided supplementary reports in 2016. Her analyses considered the opinions of Drs. Mantler, O'Neil, Evans, and Gammel with regard to Jurgenson's loss of earning capacity. Dr. Mantler found that Jurgenson was not competitively employable and therefore had a 100-percent loss of earning capacity. Dr. O'Neil opined that Jurgenson had suffered a scheduled member injury rather than an injury to the body as a whole, and accordingly had no loss of earning capacity. Dr. Gammel diagnosed Jurgenson with complex regional pain syndrome which affected her right lower extremity and he agreed with restrictions outlined by Dr. Evans. Stricklett found that relying on the reports of Dr. Evans and Gammel resulted in a 50-percent loss of earning capacity. In her supplemental report, considering the opinion of Dr. Mantler and Jurgenson's own self-reported limitations, Stricklett opined that Jurgenson would not be competitively employable, and therefore sustained a 100-percent loss of earning capacity. In her final supplemental loss of earning capacity report, Stricklett opined that if consideration is given to Dr. Evans' opinions and the restrictions recommended by Dr. Gammel, Jurgenson would experience a 50-percent loss of earning capacity.

Jurgenson filed a complaint against IPC seeking payment of disability benefits. Following trial, the court ruled in favor of Jurgenson, finding that she had suffered an injury to her body as a whole and that she was entitled to 93 5/7 weeks of temporary total disability benefits and 206 2/7 weeks of permanent partial disability benefits for a 50-percent loss of earning capacity. IPC now appeals.

## III. ASSIGNMENTS OF ERROR

IPC assigns, restated, that the trial court erred in (1) determining that Jurgenson suffered an injury to the body as a whole; (2) finding that Jurgenson sustained a 50-percent temporary loss of earning capacity from and including June 25, 2010 to and including September 29, 2015; and (3) failing to render a well-reasoned decision in violation of Nebraska Workers' Compensation Rule 11(A).

## IV. STANDARD OF REVIEW

Pursuant to Neb. Rev. Stat. § 48-185 (Cum. Supp. 2016), an appellate court may only modify, reverse, or set aside a Workers' Compensation Court decision when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Tchikobava v. Albatross Express*, 293 Neb. 223, 876 N.W.2d 610 (2016). Determinations by a trial judge of the Workers' Compensation Court will not be disturbed on appeal unless they are contrary to law or depend on findings of fact which are clearly wrong in light of the evidence. *Id.* Factual determinations by a workers' compensation trial judge have the effect of a jury verdict and will not be disturbed unless they are clearly wrong. *Gardner v. International Paper Destruction & Recycling*, 291 Neb. 415, 865 N.W.2d 371 (2015). In testing the sufficiency of the evidence to support the findings of fact by the workers' compensation court, every controverted fact must be considered in the light most favorable to the successful party and that party must be given the benefit of every inference reasonably deducible from the evidence. *Id.*

## V. ANALYSIS

### 1. Injury to Body as Whole

IPC argues that the trial court erred in finding that Jurgenson had suffered an injury to her body as a whole, rather than an injury to a scheduled member, and was therefore entitled to permanent benefits based on her loss of earning capacity. IPC claims that Jurgenson suffered impairment only to her right lower extremity and that her physical restrictions were related to this extremity, even when considering the implantation of the spinal cord stimulator. IPC argues that no expert opined that Jurgenson had suffered impairment to her body as a whole and that the only whole body impairment ratings were conversions from ratings specific to her right lower extremity. In the absence of such expert testimony, IPC argues that the trial court should have found injury to a scheduled member rather than to the body as a whole. We disagree.

A claimant is not entitled to an award for loss of earning power when his or her injury is limited to a specific body member, unless some unusual or extraordinary condition as to other members or parts of the body develops as the result of the injury. *Moyera v. Quality Pork International*, 284 Neb. 963, 825 N.W.2d 409 (2013). The test for determining whether a disability is to a scheduled member or to the body as a whole is the location of the residual impairment, not the situs of the injury. *Id.* Along with causation, the issue of whether a claimant has sustained a permanent impairment that has resulted in a loss of earning power is a question of fact to be

determined by the Workers' Compensation Court, which will be upheld on appeal absent clear error. *Stacy v. Great Lake Agri Marketing, Inc.*, 276 Neb. 236, 753 N.W.2d 785 (2008).

IPC argues that, due to the subjective nature of the injury, Jurgenson was required to present expert opinion as to whole body impairment. See *Green v. Drivers Management, Inc.*, 263 Neb. 197, 639 N.W.2d 94 (2002). IPC claims that no physician opined that Jurgenson had suffered injury or impairment to her body as a whole. Specifically, IPC points to the findings of Drs. O'Neil and Gammel, who found that Jurgenson suffered a 25-percent impairment to her right lower extremity, and Dr. O'Neil's finding that Jurgenson's permanent restrictions should be limited to that extremity. IPC argues that Dr. Evans, the physician who performed the spinal cord stimulator implantation procedure, made no findings as to permanent impairment. While IPC concedes that Jurgenson does have certain restrictions as a result of the stimulator being implanted in her spine, it claims that such restrictions are related to the injury to her right lower extremity and do not result in any additional impairment.

Dr. Evans opined, and Dr. Gammel agreed, that Jurgenson should not engage in repetitive lifting or extreme stretching of the spine, or lifting or twisting, nor should she engage in rigorous physical activity wherein her arms are repeatedly extended over her head, as such movements could cause lead migration that would require lead revision. While Dr. Evans did not explicitly state that Jurgenson had suffered an impairment to her body as a whole, the restrictions he imposed affected a significant portion of her body, including her upper body and torso. Such restrictions go well beyond affecting only her right lower extremity.

The trial court found "in a very close question that [Jurgenson] suffered a body as a whole type injury due to the implantation of the leads into [Jurgenson's] spine for the spinal cord stimulator" and the restrictions placed on Jurgenson by Dr. Evans, which included avoiding overhead lifting, vigorous activity, and flexion of the spine in order to protect the leads from the stimulator in her spine. The court found that this amounted to a body as a whole restriction and impairment. While the recommendations and findings of impairment of other physicians, such as Dr. O'Neil, are specifically related only to Jurgenson's right lower extremity, the trial court ultimately found Dr. Evans' recommendations to be credible and relied upon them in finding that Jurgenson suffered an injury to her body as a whole. See *Risor v. Nebraska Boiler*, 277 Neb. 679, 765 N.W.2d 170 (2009). Such a finding of fact will be upheld on appeal absent clear error. Contrary to IPC's claim, Dr. Evans' findings and recommendations do support a finding of injury to Jurgenson's body as a whole, rather than solely to her right lower extremity. Accordingly, we find no clear error.

## 2. FINDING OF 50-PERCENT TEMPORARY LOSS OF EARNING CAPACITY

IPC argues that the trial court erred in finding that Jurgenson suffered a temporary 50-percent loss of earning capacity from June 25, 2010 to September 29, 2014. Specifically, IPC claims that the restrictions resulting in a 50-percent loss of earning capacity did not exist prior to 2015 and that the court erred in making a finding of temporary partial disability immediately after a finding of maximum medical improvement.

## (a) 50-Percent Loss of Earning Capacity

IPC claims that the trial court erred in finding that Jurgenson had suffered a 50-percent loss of earning capacity during this period because the restrictions that led to such a loss of earning capacity did not exist until 2015, after the spinal cord stimulator was inserted. IPC argues that, while several physicians had made findings as to whether Jurgenson suffered a loss of earning capacity and to what degree she had suffered such a loss during this period, no physician found that Jurgenson had suffered a loss of 50 percent prior to such findings by Drs. Gammel and Evans in early 2015. Therefore, IPC claims that the evidence does not support the trial court's findings of such a loss of earning capacity between June 25, 2010 and September 29, 2014.

However, Dr. Mantler diagnosed Jurgenson with complex regional pain syndrome and opined in September 2011 that she could only work two hours a day. Based upon this restriction, Stricklett opined that Jurgenson would have a 100-percent loss of earning capacity. Dr. O'Neil agreed with the complex regional pain syndrome diagnosis and opined that Jurgenson would not be capable of work requiring any significant amount of standing, walking, and climbing. Stricklett did not assess a loss of earning capacity based on his opinion, however, because he considered her injury to have resulted in a single member impairment.

The determination of an employee's loss of earning power is a question of fact for the trial court. *Underwood v. Eilers Mach. & Welding,* 6 Neb. App. 631, 575 N.W.2d 878 (1998). In determining the degree of an employee's loss of earning power, the Nebraska Supreme Court has found that disability is not always commensurate with medical restrictions or impairment ratings. *Frauendorfer v. Lindsay Mfg. Co.,* 263 Neb. 237, 639 N.W.2d 125 (2002). Furthermore, an employee's disability as the basis for compensation under either total or partial disability is determined by the employee's diminution of employability or impairment of earning power or earning capacity, and such disability is not necessarily determined by a physician's evaluation and assessment of the employee's loss of bodily function. *Id.* Accordingly, the court has held that, while medical restrictions or impairment ratings are relevant to a claimant's disability, the trial judge is not limited to expert testimony to determine the degree of disability and instead may rely on the testimony of the claimant. *Tchikobava v. Albatross Express, LLC, supra.*

At trial, Jurgenson testified that she experienced symptoms and pain throughout the duration of the relevant time period, including pain and sensitivity in her foot. She testified that she could not walk more than a couple blocks at a time and that, due to the sensitivity, she experienced difficulty with everyday tasks such as taking a shower, lying under the bed sheets, walking, and wearing socks and certain footwear. She testified that she was taking her prescribed medication at the time but her symptoms persisted.

In addition, the functional capacity evaluation, performed in June 2010, found that Jurgenson could work at a light to medium physical demand level. While the evaluation stated that "Jurgenson's findings were not always consistent with anatomical and physiological principles," and that the results of the validity criteria of her exam indicated a "very poor effort and invalid test results," Jurgenson testified at trial that she had made a good effort during the exam but had struggled with it because she was sore and "it wasn't a good day" for her foot.

We find that Mantler's opinion, the functional capacity evaluation, and, particularly, Jurgenson's testimony support the trial court's finding that Jurgenson suffered a 50-percent loss

of earning capacity from June 25, 2010 to September 29, 2014. Accordingly, we find no merit to this assignment of error.

(b) Temporary Partial Disability Benefits

IPC claims that the trial court erred in finding that Jurgenson suffered temporary partial disability from June 25, 2010 to September 29, 2014 because it found that Jurgenson had reached maximum medical improvement on June 24, 2010. Accordingly, IPC argues that any finding of disability after maximum medical improvement has been reached must, as a matter of law, be permanent rather than temporary.

Jurgenson argues that this issue is moot because the parties stipulated to an average weekly wage of $725.67 for both temporary and permanent disability calculations. We agree.

The calculation of partial disability benefits is governed by Neb. Rev. Stat. § 48-121(2) (Reissue 2010), which states that:

> This compensation shall be paid during the period of such partial disability but not beyond three hundred weeks. Should total disability be followed by partial disability, the period of three hundred weeks mentioned in this subdivision shall be reduced by the number of weeks during which compensation was paid for such total disability.

However, the statute does not differentiate between disability benefits that are temporary or permanent in nature. In the present case, the trial court used this formula to determine that Jurgenson was entitled to 206 2/7 weeks of partial disability benefits for a 50-percent loss of earning capacity. This calculation would have been the same whether the trial court treated the partial benefits as temporary or permanent. Indeed, IPC concedes in its reply brief that "[i]f it is determined that Appellee suffered an injury to her body as a whole, Appellant acknowledges that pursuant to the [c]ourt's October 14, 2016 [a]ward Appellee is entitled to 93 5/7 weeks of temporary total disability and 206 2/7 weeks of permanent disability benefits at a rate of $241.89 based on a 50 percent loss of earning capacity." Reply brief for appellant at 11. As discussed in the analysis of IPC's first assignment of error, we found that Jurgenson did suffer an injury to her body as a whole. Accordingly, IPC admits that Jurgenson was entitled to the benefits as awarded by the trial court.

Because § 48-121(2) treats temporary and permanent partial disability benefits in the same manner and the parties stipulated to the same average wage under either classification, we find that the amount of indemnity owed Jurgenson does not differ regardless of whether the disability is classified as temporary or permanent in this instance. Therefore, while it may have been incorrect to classify the disability as temporary, it is not reversible error.

3. FAILURE TO RENDER WELL-REASONED DECISION

IPC's final assigned error is that the decision of the trial court did not "provide the basis for a meaningful appellate review" or specify the evidence relied upon, in violation of Nebraska Workers' Compensation Court Rule 11(A).

Workers' Compensation Court Rule 11(A) states, in relevant part, that "[d]ecisions of the court shall provide the basis for a meaningful appellate review. The judge shall specify the evidence upon which the judge relies."

The trial court specifically discussed the evidence it relied upon to support its finding that Jurgenson suffered an injury to her body as a whole that resulted in a 50-percent loss of earning capacity. It discussed the treatment Jurgenson underwent with various physicians, the physicians' opinions as to her injury and loss of earning capacity, the functional capacity evaluation, the loss of earning capacity analysis, and Jurgenson's own testimony.

IPC also claims that the trial court's order violated Rule 11(A) because the court stated that Jurgenson had sustained a 50-percent temporary partial loss of earning capacity for the period from June 24, 2010 to September 29, 2014 but never addressed such benefits again nor did it order the payment of any such benefits. However, the trial court addressed all partial disability benefits together in its finding that Jurgenson was entitled to 206 2/7 weeks of partial benefits. Due to the parties' stipulation to an average weekly wage of $725.67 for both temporary and permanent benefits, it did not matter whether such benefits were classified as either temporary or permanent, and it was therefore not necessary for the court to make such a classification. It is apparent from the order that the 206 2/7 weeks of partial benefits encompassed all partial benefits to which Jurgenson was entitled, including from June 24, 2010 to September 29, 2014.

We find that the trial court did specify the evidence upon which it relied in making its findings and that its decision provided the basis for a meaningful appellate review. Accordingly, we find no error.

## VI. CONCLUSION

Based on our review of the record, we reject IPC's assignments of error and therefore affirm the award.

AFFIRMED.