IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

FINKE V. EMPLOYER SOLUTIONS STAFFING

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SCOTT R. FINKE, APPELLANT,

V.

EMPLOYER SOLUTIONS STAFFING AND ITS INSURER, ACCIDENT FUND NATIONAL
INSURANCE COMPANY, DOING BUSINESS AS UNITED HEARTLAND, APPELLEES.

Filed May 30, 2017.    No. A-16-937.

Appeal from the Workers' Compensation Court: JOHN R. HOFFERT, Judge. Affirmed.

William J. Erickson for appellant.

Abigail A. Wenninghoff, of Larson, Kuper, Wenninghoff & Carney, for appellees.

MOORE, Chief Judge, and BISHOP, Judge.

MOORE, Chief Judge.

## INTRODUCTION

Scott R. Finke appeals from the order of the Nebraska Workers' Compensation Court denying certain portions of his claim for workers' compensation benefits from his former employer, Employer Solutions Staffing. On appeal, Finke argues that the compensation court erred in failing to consider his preexisting mental health conditions as part of his loss of earning capacity, accepting the opinion of a particular vocational rehabilitation counselor as binding, finding that Finke was permanently partially disabled rather than permanently totally disabled, and failing to order payment of future medical expenses. For the reasons set forth below, we affirm.

- 1 -

BACKGROUND

On June 21, 2012, Finke was employed as a general laborer and injured his back while bending over to pick up a radiator. He did not return to work for Employer Solutions following this injury.

On September 23, 2015, Finke filed a petition in the compensation court, alleging that he had sustained personal injury in an accident arising out of and in the course of his employment on or about June 21, 2012, and that, as a result, he was entitled to disability benefits. Finke alleged that the work-related injury to his lumbar and lumbo-sacral spine required surgery and that the resulting pain and stress of his injury had aggravated "certain mental health deficits." Finke alleged that he had embarked on a course of vocational rehabilitation, which was unsuccessful and that he was permanently and totally disabled. In addition to disability benefits, Finke sought the payment of accrued and continuing medical expenses, vocational rehabilitation benefits, and penalties and interest. On October 14, Employer Solutions answered Finke's petition, admitting that Finke injured his back in an accident arising out of and in the course of his employment, but denying most of Finke's remaining assertions.

Trial was held before the compensation court on July 12, 2016. In addition to hearing testimony from Finke and the president and owner of a company hired by Employer Solutions to recruit candidates for positions, the court received exhibits including Finke's medical records, medical bills, and reports of the vocational rehabilitation counselors retained in this case. Prior to the presentation of testimony, the parties stipulated: (1) that Finke was employed by Employer Solutions on June 21, 2012; (2) that Finke sustained an injury to his lower back arising out of and in the course and scope of his employment on that date; (3) that Ted Stricklett was the agreed-upon vocational rehabilitation counselor tasked with assessing Finke's loss of earning capacity as well as his vocational rehabilitation needs; and (4) that venue was proper.

Finke has a bachelor of science degree in travel and tourism with a minor in business administration. He has worked in restaurant management, in lawn care and landscaping, and as a "Detox Intake Worker." Finke owned his own landscaping company between 1995 and 2005 but did not work in the winter during this period. He primarily worked in restaurants during the winter. In 2005, Finke underwent back surgery following an ATV accident in which he sustained compound fractures to two vertebrae. Finke continued to have back pain following the ATV accident. He did not work between 2005 and 2012, when he began working for Employer Solutions. Finke testified that he obtained employment on three occasions during this period but quit each of these jobs after several weeks because he could not "perform right" due to the back pain and his mental condition. Finke resided with his parents between 2005 and 2012. Finke was asked at trial about a psychological evaluation from 2010 which indicated he was depressed due to his inability to work and residing with his parents. The evaluation indicated that Finke was not employed outside the home due to seizures. At trial, Finke testified that he was on a medication called Wellbutrin and that he suffered seizures as a side effect. Finke testified that after being taken off this medication, he had no further seizures.

Records from a mental health center in January 2010 show that Finke had a history of alcohol dependence and was diagnosed with bipolar disorder. Psychiatric progress notes from

April and June show that he was receiving medications for his bipolar disorder and to treat seizures. In August, Finke underwent a psychiatric diagnostic evaluation at the Lanning Center for Behavioral Sciences and was diagnosed with "Bipolar I disorder, most recent episode manic, sever, with no psychosis. Generalized anxiety disorder." At that time, Finke was limited by his "[s]evere and persistent mental illness." He also suffered from a seizure disorder and chronic back pain secondary to the ATV accident. The evaluation indicates that Finke was living with his parents due to his seizures. The "Current stressors" section of the evaluation states that Finke's greatest stressors were "his current living situation and trying to be on his own. Financial concerns and employment issues resulting from his health issues (his seizures) are very stressful for him." At the time of his evaluation in August, Finke was experiencing difficulties with depression, impulsive behavior, falling asleep and staying asleep, extreme mood swings, focus and concentration, racing thoughts, task completion, distraction, and poor judgment. Finke received treatment for his mental health diagnoses at the Lanning Center through June 2011. In June 2011, symptoms noted included depression, difficulty sleeping, irritability, mood swings, confused thinking, loss of "train of thought," lack of concentration or attention, inability to "stay on one topic to closure," and he had to be repeatedly redirected.

Following his work-related accident, Finke saw Dr. James Mahalek, an orthopedic surgeon, for low back and left leg pain in July 2012. In August, Mahalek reviewed the results of an MRI that showed significant degenerative disk disease with collapse at L5-S1. Mahalek's impression at that time was lumbar degenerative disk disease, chronic lumbar herniated disk, lumbar stenosis, lumbar radiculopathy, old thoracolumbar fracture, and aggravation of underlying preexisting degenerative disk disease and herniated disk L5-S1. Mahalek recommended a series of epidural steroid injections. Eventually, Mahalek recommended a lumbar decompression surgery at L5-S1, which was performed in December. By January 24, 2013, Mahalek felt Finke could perform some part-time light duty work. In March 2013, Finke was instructed to advance his activity on a progressive level and begin physical therapy. Mahalek performed several "SI joint injections," and in August, Mahalek cautioned Finke about using his pain medication as directed and prescribed physical therapy.

In November 2013, Dr. Chris Cornett conducted an independent medical examination of Finke and diagnosed "chronic pain syndrome for [Finke's] low back pain status post a fusion for prior degenerative dis[k] disease and a bulging dis[k]." Cornett recommended a CT scan and opined Finke had not reached maximum medical improvement (MMI), stating Finke's pain seemed too high to return to work, and recommended waiting until Finke had performed a functional capacity evaluation (FCE) to determine his work status.

Finke treated with Dr. Burt McKeag for pain management between August 20, 2013 and July 5, 2016, one week before trial. During this period, McKeag prescribed numerous injections, medications, and nerve blocks, which had varying amounts of success in relieving Finke's pain. On February 24, 2014, Finke's chief complaint was bilateral lumbar pain. At that time he refused his scheduled injections and was not taking his opioid pain medication, and McKeag opined that Finke had reached MMI. In June, Finke returned, requesting further lumbar facet injections for low back pain which he rated "at a 7-8." Finke continued to receive treatment from McKeag for his pain and at his visit on July 5, 2016, Finke reported that he continued to have low back pain

from the June 2012 injury, that "his Butrans patch is helpful," but that he was concerned about the cost. McKeag discussed the risk and benefits of "an intrathecal pain pump" with Finke. The treatment plan was to schedule Finke for a psychological exam, have a Fentanyl pain pump trial, and continue the Butrans patch, with a follow-up visit in a month.

On March 14, 2014, Finke completed an FCE that was deemed "a VALID representation of [Finke's] present physical capabilities." The results placed Finke in the partial medium physical demand category and showed that he could occasionally lift 35 pounds from floor to waist, 30 pounds from waist to shoulder, and 30 pounds above shoulder. Finke could frequently lift 25 pounds from floor to waist, and he could carry 40 pounds for 150 feet, push 70 pounds for 40 feet, and pull 60 pounds for 40 feet. Finke had a full functional range of motion in all planes except flexion, where he was "a little limited, but still functional." He could climb stairs safely and occasionally bend, twist, and overhead reach. He could sit and stand for 90 minutes prior to a break.

In April 2014, Cornett reviewed the results of the FCE and agreed that Finke was in the partial medium work category. Cornett also agreed with the placement of MMI as of February 24, 2014. As to permanent restrictions, Cornett agreed with occasional lifting below the waist to 35 pounds, lifting 30 pounds to shoulder height, and lifting 30 pounds overhead. Cornett agreed with restrictions of occasional bending, squatting, kneeling, stair climbing, ladder climbing, overhead reaching, and forward reaching, and he felt that unlimited sitting and standing would be reasonable.

An updated FCE, completed in August 2014, showed increases in Finke's lifting abilities. At that time, he could occasionally lift 65 pounds from floor to waist, 40 pounds from waist to shoulder, and 40 pounds above shoulder. Finke could frequently lift 40 pounds from floor to waist, and he could carry 60 pounds for 150 feet, push 80 pounds for 40 feet, and pull 75 pounds for 40 feet. And, he could sit or stand for 120 minutes prior to a break.

Dr. Jessica Bailis, Psy.D., examined Finke in July 2015 "for Social Security Disability Benefits" and issued a report. Bailis reported that Finke's thought process appeared organized and his thought content was normal. He had difficulty with short-term memory and concentration, and he reported sleep issues, as well as low energy. Bailis observed no signs of anxiety, tension, or substance abuse, however, Finke exhibited psychomotor retardation and appeared to react and respond to questions slowly. Bailis found that Finke was restricted in his activities of daily living as he appeared very lethargic, had low energy, but he did not appear to have difficulty maintaining social functioning or relating appropriately to others. Finke appeared able to remember and carry out simple instructions, but Bailis felt he would likely have more difficulty with complex instructions. Finke had an inability to sustain concentration and attention during the interview with Bailis and was not able to complete tasks being asked of him. Bailis found Finke's prognosis guarded from a mental health standpoint. Finke appeared to be having symptoms of depression and had a history of manic episodes. Bailis felt Finke might benefit from individual therapy in addition to the medication he was already receiving to manage his symptoms. Bailis noted Finke's report that he "has severe back pain that affects his ability to work," but she stated that a medical doctor would need to address that claim. Due to Finke's excessive spending during manic episodes, Bailis recommended that he receive assistance to manage any funds that were awarded.

In December 2016, Finke's attorney sent a letter to Dr. Navdeep Sood, who according to the letter, had treated Finke "for his mental health needs." The letter informed Sood that Finke had applied for Social Security disability benefits and was also "dealing with a serious back injury" in the compensation court. Finke's attorney asked Sood to complete a "Mental Residual Functional Capacity Assessment" and to answer certain questions. In response to the question asking what future treatment Sood recommended for Finke, Sood responded, "will continue with psychotropic meds plus follow up with primary providers for physical health management."

In the mental residual functional capacity assessment, Sood found Finke markedly limited in terms of his ability to understand and remember detailed instructions and his ability to maintain attention and concentration for extended periods. Finke was moderately limited in terms of his ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; to carry out detailed instructions; and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. He was also moderately limited in his ability to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Finke was not significantly limited in the other nine areas assessed by Sood. In a note elaborating on these findings, Sood stated:

> [Finke's] struggles with anxiety and Bipolar illness makes it difficult for him to maintain his attention and concentration for period of time. Also, he is more sensitive to criticism, difficulty with social interaction secondary to his limited capacity skills which is part of his Bipolar illness. His memory is [a]ffected by it as well. Problems with sleep can contribute to daytime lethargy. Difficulty with impulsiveness can contribute to anger outbursts and poor judgement.

Sood found Finke met the criteria for "Bipolar disorder type I" and "Generalized Anxiety d/o." In terms of Finke's bipolar disorder, Sood noted, "Pt. presents with a history of extreme mood swings which have responded well to psychopharmacologic intervention but [Finke] continues to have frequent breakthrough symptoms." Sood included a consultant note stating:

> [Finke] has a chronic history of struggles with moods and anxiety dating back about 7 years. Has been tried on multiple meds in the past, responding partially to current meds. Has sequelae in his personal, social and family life due to this. It has been further complicated with comorbid back problems which has made his psychiatric symptoms worse.

The record does not include medical records of any actual treatment of Finke by Sood.

Ted Stricklett completed a loss of earning capacity report dated April 3, 2014. Stricklett opined that Finke had suffered a 25-percent loss of earning capacity based in part upon the FCE completed by Finke in March 2014. In forming this opinion, Stricklett observed that no limitations had been placed on Finke's work hours, so Stricklett assumed that Finke would be able to tolerate

full-time employment as long as he observed his other restrictions. In a supplemental opinion, authored by Stricklett on August 22, he reviewed Finke's updated FCE and amended his opinion to state that Finke's loss of earning capacity approximated 15-percent.

Finke was approved for vocational rehabilitation services, specifically a 90-day job search plan with services provided by Stricklett to assist him in locating suitable employment in his labor market area. In June 2014, Finke reported to Stricklett that he had a 2-hour interview with an employer, who only had positions for employees who could lift up to 40 pounds on occasion. Finke complied with the requirement of the plan that he apply for 6 to 8 jobs each week and in July, informed Stricklett that his 35-pound lifting restriction was inhibiting his hiring because most companies had a 40-pound requirement. Finke's 90-day plan ended on September 5, 2014 without him finding employment. After Finke's lifting restrictions were increased, a 60-day job search plan extension was initiated. Finke again complied with the plan requirements, but his physical restrictions were still an issue. In a November 3, 2014 progress report, Stricklett noted that Finke was contemplating moving to Colorado to work in sales for a family member's business. Stricklett noted that Finke had not secured employment in the Kearney, Nebraska labor market area and that several of the staffing agencies would no longer provide him work due to his physical restrictions. The end date of Finke's 60-day plan was November 7, and Finke informed Stricklett that he would voluntarily continue to apply for positions upon the end of the 60-day plan.

Dean Venter provided a rebuttal loss of earning capacity opinion in a report dated April 12, 2016. Venter's evaluation was conducted in the form of a file review. Venter noted Stricklett's loss of earning capacity opinions based on the physical limitations shown by the FCEs. Venter stated that based on the information he reviewed, he would agree with Stricklett's assessments as to loss of earning capacity "assuming these physical limitations alone." Venter stated that Stricklett "had to be aware of" but had not addressed Finke's mental health issues. Venter noted information about Finke's mental health issues and medications provided by Finke in a new patient form completed for Cornett in November 2013, although Venter had not been provided with Cornett's actual medical reports. Venter stated:

> This information, coupled with [Stricklett's] evaluation of [Finke's] job history largely consisting of low level work, even though he had a college degree, would indicate from a vocational perspective that there is more going on here than physical restrictions alone. [Stricklett], however, makes no mention of mental disorders or the obvious disconnect between [Finke's] educational achievement and his job history.

Venter observed that in reaching his loss of earning capacity opinions, Stricklett would not have had access to the later mental health evaluations of Finke by Sood and Bailis. Venter determined that the mental health limitations outlined by Sood and Bailis would preclude Finke's ability to maintain employment and would result in a total loss of earning capacity of 100 percent. Venter noted that information about Finke's mental health difficulties would have been available to Stricklett in some of the records Stricklett did review, and Venter opined that Stricklett's failure to mention these difficulties "constitutes a major error" in Stricklett's conclusions. Venter again noted Sood's statement that Finke's "comorbid back problem made his psychiatric problems worse." Venter stated, "There is no question that at this time, if [Finke's] psychiatric limitations

are given consideration in addition to his physical limitations, that he would not be able to maintain employment and would have a 100 percent loss of earning capacity."

On August 16, 2016, the compensation court entered an award of benefits to Finke. The court awarded temporary disability benefits and permanent partial disability benefits and ordered the payment of specified medical expenses incurred by Finke. The court accepted Mahalek's opinion that Finke sustained an aggravation of his preexisting degenerative disk disease with a resulting herniated disk at L5-S1 as a result of the stipulated accident.

The compensation court then reviewed the evidence with respect to Finke's claim of a mental health aggravation. The court observed that while Bailis found Finke suffered from certain deficits in his level of functioning, there was no indication that the restrictions or limitations she noted were impacted in any way by Finke's June 2012 work-related accident and injury. The court stated that it was accordingly "left to wonder whether or not [Finke] suffered from various limitations or restrictions (again, from a psychological viewpoint) prior to the accident of June 2012 and what role, if any, the accident truly played."

The compensation court also discussed Sood's report at length. The court first observed that records of any treatment of Finke by Sood had not been introduced into evidence and that background information in any such records might have proven useful to the court's analysis. The court stated:

> As it stands, the best that [Sood] could offer was that [Finke's] psychiatric symptoms were worse owing to [Finke's] comorbid back problems. . . . Just how and in what respects [Finke's] back problems made his psychiatric symptoms worse is noticeably left unanswered. The extent to which [Sood] was even aware of or otherwise familiar with [Finke's] long history of mental health problems is also unclear. At best, he only references his understanding that [Finke] has a 'chronic history of struggles with moods and anxiety dating back about 7 years.' . . . To say that something has been made worse suggests some level of knowledge of what that something was before the offending event or circumstance. Again, there is no indication that [Sood] was truly privy to any prior psychological evaluations or records. Rather, only a conclusory statement is offered.

The court then observed that Sood's assessment of Finke's mental functional capacity in 2016 was "eerily similar" to evaluations of Finke performed prior to the accident of 2012, revealing many of the same shortcomings. The court concluded by stating:

> In summary, the commonality of psychological findings between [Sood's] post-accident evaluation and the findings of several pre-accident psychiatric evaluations simply does not persuasively establish just how and in what manner [Finke's] back injury made his psychiatric symptoms worse. The Court was simply left wanting more than was offered. The conclusory statement by [Finke's] expert along with the undersigned's concern over whether [Sood] had a full and complete history of [Finke's] prior mental health deficits coupled with the overall lack of any insightful analysis as to the basis for his conclusions leads the Court to find them unpersuasive.
>
> In the end, the Court finds that [Finke] has proven that he sustained a physical injury to his low back . . . and no more. While the Court does not pretend to know the inner

workings of the human mind, the medical or psychiatric evidence presented in this case simply does not allow the undersigned to reach the conclusion urged by [Finke]. [Finke's] mental health shortcomings existed long before the subject accident and were not persuasively shown to have been made worse by that accident.

After determining Finke's average weekly wage at the time of the accident and his periods of temporary disability, the compensation court addressed Finke's entitlement to permanent disability benefits. The court reviewed both Stricklett's and Venter's opinions with respect to Finke's loss of earning capacity. The court observed that Venter primarily disagreed with Stricklett in terms of factoring in Finke's mental health issues, which Venter felt would result in a 100-percent loss of earning capacity for Finke. The court stated:

> As will be recalled by the reader, the Court rejected the suggestion that [Finke's] accident and injury served to aggravate his preexisting mental health issues. The shortcomings in the opinions of [Sood] were previously detailed above. In sum, [Finke] was encumbered with various restrictions or limitations associated with his preexisting mental health problems long before the accident at issue.
>
> [Venter] to his credit correctly observed that there was an 'obvious disconnect between [Finke's] educational achievement level and his job history.' . . . . However, the fact finder notes that 'disconnect' existed well before the accident that is the subject of this litigation. . . .

The court concluded that the rebuttable presumption of correctness attached to Stricklett's opinions had not been refuted. In choosing between Stricklett's proffered opinions, the court determined that Finke's loss of earning capacity was 15-percent, reasoning that the "later in time opinion would be the more relevant one given . . . the findings of the subsequent FCE."

Finally, the compensation court addressed Finke's right to medical benefits. The court ordered the payment of certain medical bills. However, it declined to award future medical benefits, finding that the parties had not entered into a stipulation establishing Finke's right to an award of future medical benefits and that a review of the medical evidence submitted "fails to unearth any explicit medical opinion persuasively establishing that [Finke] is in need of further medical care for his low back injury." The court also denied Finke's request for further vocational rehabilitation benefits and his request for an award of sanctions.

## ASSIGNMENTS OF ERROR

Finke asserts, restated, that the compensation court erred in (1) failing to consider his preexisting mental health conditions as part of his loss of earning capacity, (2) accepting the vocational opinion of Stricklett as binding and finding that Finke was permanently partially disabled rather than permanently totally disabled, and (3) failing to order the payment of future medical expenses.

STANDARD OF REVIEW

A judgment, order, or award of the Workers' Compensation Court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Damme v. Pike Enters.*, 289 Neb. 620, 856 N.W.2d 422 (2014). In determining whether to affirm, modify, reverse, or set aside a judgment of the Workers' Compensation Court review panel, a higher appellate court reviews the findings of the trial judge who conducted the original hearing; the findings of fact of the trial judge will not be disturbed on appeal unless clearly wrong. *Potter v. McCulla*, 288 Neb. 741, 851 N.W.2d 94 (2014). In workers' compensation cases, an appellate court determines questions of law. *Gardner v. International Paper Destr. & Recycl.*, 291 Neb. 415, 865 N.W.2d 371 (2015).

ANALYSIS

*Loss of Earning Capacity.*

Finke asserts that the compensation court erred in failing to consider his preexisting mental health conditions as part of his loss of earning capacity.

Under Neb. Rev. Stat. § 48-121 (Reissue 2010), a workers' compensation claimant may receive permanent or temporary workers' compensation benefits for either partial or total disability. *Gardner v. International Paper Destr. & Recycl., supra.* "Temporary" and "permanent" refer to the duration of disability, while "total" and "partial" refer to the degree or extent of the diminished employability or loss of earning capacity. *Id.* Total disability does not mean a state of absolute helplessness. *Id.* It means that because of an injury (1) a worker cannot earn wages in the same kind of work, or work of a similar nature, that he or she was trained for or accustomed to perform or (2) the worker cannot earn wages for work for any other kind of work which a person of his or her mentality and attainments could do. *Id.*

Finke does not attack the compensation court's finding that the evidence did not show that his mental health issues had been aggravated by his work-related accident. Rather, he argues that the compensation court should have taken his mental health issues into consideration and applied the odd-lot doctrine in this case in determining his loss of earning capacity. Under the "odd-lot" doctrine, total disability may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market. *Armstrong v. State*, 290 Neb. 205, 859 N.W.2d 541 (2015). A worker may be totally disabled for all practical purposes, despite being able to find trivial, occasional employment under rare conditions at small remuneration. *Id.* Whether a claimant has suffered a loss of earning power or is totally disabled are questions of fact. *Id.*

Finke relies on *Gardner v. International Paper Destr. & Recycl., supra*. In that case, the employee initially received an award of temporary benefits. In making that award, the compensation court found that the employee's preexisting cognitive deficits were temporarily aggravated by the accident but resolved without permanent impairment as a result of the

work-related accident. The employer subsequently filed a petition to modify, and the court entered a further award, applying the odd-lot doctrine and finding that given the employee's preexisting mental and cognitive deficits and based upon his work-related injuries, the employee was permanently and totally disabled. Reports of two doctors who treated the employee's mental and cognitive deficits noted that the employee suffered from depression, dizziness, cognitive and memory problems, anxiety, and post-traumatic stress disorder, which conditions limited the employee's ability to work. On appeal, the Nebraska Supreme Court found that these symptoms as well as the employee's reported difficulty with "word finding," had relevance to the employee's employability and that the compensation court did not err when it considered the doctor's reports. 291 Neb. at 437. In affirming the compensation court's application of the odd-lot doctrine, the Supreme Court held that the lower court could rely on both the employee's work-related injury and his preexisting mental and cognitive conditions, which included depression and anxiety, to determine the extent of his disability and find him permanently and totally disabled.

Finke argues that by not considering the effect of his preexisting mental health conditions on his disability and declining to apply the odd-lot doctrine, the compensation court applied an enhanced burden of proof. Finke observes that a workers' compensation claimant can recover benefits when an injury, arising out of and in the course of employment, combines with a preexisting condition to produce a disability. *Gardner v. International Paper Destr. & Recycl.*, 291 Neb. 415, 865 N.W.2d 371 (2015). He also notes *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 461 N.W.2d 565 (1990), wherein the Nebraska Supreme Court disapproved of language in previous cases applying an enhanced degree of proof requirement with respect to causation in workers' compensation cases involving a preexisting disability or condition. Finke argues that the compensation court in this case applied a similar enhanced burden of proof with respect to his preexisting mental health conditions and the odd-lot doctrine.

We find no error in the compensation court's failure to apply the odd-lot doctrine in this case in order to find Finke permanently totally disabled. Unlike the situation in *Gardner v. International Paper Destr. & Recycl., supra*, where there was medical evidence that the employee's preexisting conditions limited the employee's ability to work, there is no medical evidence here with respect to the effect of Finke's mental health conditions on his ability to work, or more specifically, to be employed regularly in any well-known branch of the labor market. See *Armstrong v. State*, 290 Neb. 205, 859 N.W.2d 541 (2015). The record does not show specific work restrictions due to Finke's mental health conditions either before or after his work-related accident and does not support a conclusion that Finke's preexisting mental health condition had an effect on his ability to find employment before or after the injury. While the record shows that Finke has issues with focus, memory, and concentration, he reported to Bailis that he had no issues with learning disabilities. Bailis found that Finke could understand and remember simple instructions, carry out short and simple instructions, relate appropriately to coworkers, and adapt to changes in environment. Finke was able to earn a college degree and maintain employment prior to this accident. During his job search efforts, there was no indication that any mental health restrictions were limiting his ability to find employment; Stricklett's records only show that Finke's physical restrictions were a factor. In short, while consideration of Finke's preexisting mental health conditions was relevant to a determination of his loss of earning capacity, the record

does not support a conclusion that they combined with his physical disabilities in such a way as to render him totally disabled. While the record shows that Finke's physical restrictions made it so that he could no longer work in jobs in the medium to heavy physical demand category, the record does not show that Finke could not earn wages for any other kind of work which a person of his or her mentality and attainments could do. *Gardner v. International Paper Destr. & Recycl., supra*. This assignment of error is without merit.

*Opinion of Vocational Rehabilitation Counselor.*

Finke asserts that the compensation court erred in accepting the vocational opinion of Stricklett as binding and finding that Finke was permanently partially disabled rather than permanently totally disabled.

Under Neb. Rev. Stat. § 48-162.01(3) (Reissue 2010), a loss of earning power evaluation performed by a vocational rehabilitation counselor selected by the parties is entitled to a rebuttable presumption of correctness. *Frauendorfer v. Lindsay Mfg. Co.*, 263 Neb. 237, 639 N.W.2d 125 (2002). A rebuttable presumption is generally defined as a presumption that can be overturned upon the showing of sufficient proof. *Id.* In all cases not otherwise provided for by statute or by the Nebraska Evidence Rules, a presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence. *Id.* This rule applies to the rebuttable presumption that an opinion regarding loss of earning capacity expressed by a vocational rehabilitation counselor appointed or selected pursuant to § 48-162.01(3) is correct. *Frauendorfer v. Lindsay Mfg. Co., supra*. In determining whether the presumption contained in § 48-162.01(3) has been rebutted, the single judge is required to make factual findings. *Frauendorfer v. Lindsay Mfg. Co, supra*.

The compensation court in this case noted that Stricklett's opinions as to Finke's loss of earning capacity were entitled to a rebuttable presumption of correctness. The court observed that Venter essentially agreed with Stricklett's assessments in light of Finke's physical limitations, but felt that when Finke's mental health issues were factored in, he had sustained a 100-percent loss of earning capacity. The court noted that Venter had observed a "disconnect" between Finke's level of education and his job history, but the court determined that this disconnect existed long before Finke's work-related accident.

Finke argues that the presumption of correctness with respect to Stricklett's report was fully rebutted. He argues that Stricklett's loss of earning capacity opinions were inaccurate because of the "assumption (by omission) that [Finke's] mental health deficits did not exist." Brief for appellant at 17. He argues further that Stricklett "presented an incorrect understanding of the 'odd-lot' doctrine (by not considering that doctrine at all)." *Id.*

We have already rejected Finke's arguments that the odd-lot doctrine was applicable in this case, and we find no error in the compensation court's determination that Stricklett's opinions as to loss of earning capacity had not been rebutted. Although Stricklett did not have the benefit of some of the later mental health analyses at the time he rendered his opinion, there was information about Finke's mental health conditions in the records reviewed by Stricklett. Venter relied heavily on Sood's report, which was rejected by the compensation court in connection with its consideration of Finke's claim that his back injury had aggravated his preexisting mental health

conditions. In terms of Finke's loss of earning capacity, the record does not show the effect of these conditions on Finke's employability. The compensation court did not err in finding that Stricklett's report was unrebutted.

*Future Medical Expenses.*

Finke asserts that the compensation court erred in failing to order the payment of future medical expenses.

Before an order for future medical benefits may be entered, there should be a stipulation of the parties or evidence in the record to support a determination that future medical treatment will be reasonably necessary to relieve the injured worker from the effects of the work-related injury or occupational disease. *Tchikobava v. Albatross Express*, 293 Neb. 223, 876 N.W.2d 610 (2016). An award of future medical expenses requires explicit evidence that future medical treatment is reasonably necessary to relieve the injured worker from the effects of the work-related injury. *Id.* In *Tchikobava*, the Nebraska Supreme Court found the evidence insufficient to support a determination that future medical treatment would be reasonably necessary to relieve the injured worker from the effects of his work-related injury. The worker in that case was taking pain medication at the time of trial and had taken pain medication in the past, but the Court found that did not constitute sufficient explicit evidence that the worker would need to continue taking such medication or be awarded future medical expenses. See, also, *Adams v. Cargill Meat Solutions*, 17 Neb. App. 708, 774 N.W.2d 761 (2009) (evidence employee currently taking or had history of taking pain medication not enough to demonstrate employee required future medical treatment to relieve effects of injury).

Because the parties in this case did not stipulate regarding an award of future medical treatment, Finke was required to present evidence showing he was entitled to an award of future medical expenses. In its award, the compensation court stated that a review of the medical evidence submitted "fails to unearth any explicit medical opinion persuasively establishing that [Finke] is in need of further medical care for his low back injury." Accordingly, the court declined to enter such an award.

Finke does not point to explicit evidence showing that future medical treatment is reasonably necessary to relieve him from the effects of his work-related injury, but he argues that he was being treated for back pain by medication up until the time of trial. He points to McKeag's records showing that Finke was scheduled for a psychological exam, a Fentanyl pain pump trial, and continued use of a Butrans patch. He also points to his own testimony at trial. Finke testified that McKeag was "giving me the morphine patch" and had scheduled him for an appointment to inject Fentanyl to see if Finke was a candidate for a pain pump. Finke argues that this case differs from *Tchikobava* because his treatments for pain were not just in the past and immediately before trial but were continuing well into the future.

Although Finke has taken pain medication in the past and was receiving pain treatments at the time of trial, the record does not contain explicit evidence showing future medical treatment would be reasonably necessary to relieve Finke from the effects of his work-related injury. The court did not err in failing to award future medical expenses.

CONCLUSION

The compensation court did not in err in its determinations with respect to Finke's loss of earning capacity, permanent partial disability, or entitlement to future medical expenses. Accordingly, we affirm.

AFFIRMED.

INBODY, Judge, participating on briefs.