IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

OMAHA STEAKS INTERNAT. V. PETERSEN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

OMAHA STEAKS INTERNATIONAL, INC., APPELLEE,

V.

MONIQUE PETERSEN, APPELLANT.

Filed September 15, 2020.    No. A-20-012.

Appeal from the Workers' Compensation Court: DANIEL R. FRIDRICH, Judge. Affirmed.

Monique Petersen, pro se.

Joseph W. Grant and Kelsey J. Paumer, of Prentiss Grant, L.L.C., for appellee.

MOORE, Chief Judge, and BISHOP and WELCH, Judges.

MOORE, Chief Judge.

### INTRODUCTION

Monique Petersen appeals from the order of the Nebraska Workers' Compensation Court denying certain portions of her claim for workers' compensation benefits from her former employer, Omaha Steaks International, Inc. (Omaha Steaks). On appeal, Petersen asserts that the compensation court erred in denying future medical care and permanent disability benefits for her neck and left elbow injuries that arose from work accidents in December 2017. For the reasons set forth below, we affirm.

### BACKGROUND

Petersen was an employee of Omaha Steaks from July 10, 2017, through January 26, 2018, working as a freezer assembler. On August 28, 2017, she suffered bilateral carpal tunnel syndrome in an accident arising out of and in the course of her employment with Omaha Steaks.

Subsequently, she allegedly suffered work-related injuries to her neck and left elbow, and it is these two injuries that are the subject of the present appeal.

In January 2018, Omaha Steaks filed a petition in the compensation court, seeking to obtain Petersen's medical records. In August, the court dismissed the petition without prejudice upon Omaha Steaks' motion.

On December 13, 2018, Petersen, pro se, filed a petition seeking benefits under the same docket and page as the previous petition filed by Omaha Steaks (which is why she was designated as the defendant, despite being the injured worker). Petersen was pro se throughout the proceedings below and continues to be self-represented on appeal. In her petition, she alleged three different accidents and injuries while working for Omaha Steaks: the bilateral carpal tunnel syndrome on August 28, 2017, injury to her neck on December 4, and injury to her left elbow on December 22. She alleged that all three injuries were caused by repetitive movements doing rigorous physical labor for extensive amounts of time. She sought indemnity and future medical benefits and the payment of unpaid medical bills.

Petersen sought to proceed in forma pauperis below, but the compensation court denied her application, finding no statutory authority for her requested relief. During the hearing on Petersen's application, Petersen expressed concern about the cost of having medical experts to testify for her at trial. The court then informed her that the doctors did not have to testify in person as to the causation of her injuries, but that she could provide signed, written reports in lieu of their live testimony.

Trial was held before the compensation court on October 24 and November 1, 2019. The court heard testimony from Petersen and four representatives of Omaha Steaks, and it received numerous medical records, bills, and other documentary exhibits offered by the parties. The parties stipulated that Petersen was an employee of Omaha Steaks on the dates in question, that she gave notice of her alleged accidents as statutorily required, and that she suffered bilateral carpal tunnel syndrome in a work-related accident on August 28, 2017, also stipulating as to her entitlement to a certain minimum amount of permanent disability benefits for that accident. The medical records admitted into evidence were voluminous, and much of the trial testimony was not relevant to the issues before the trial court or on appeal. Given the issues raised on appeal, we have only summarized evidence relevant to the causation of Petersen's alleged neck and left elbow injuries.

The record reflects some variation between what Petersen said was required in her job and what was shown in Omaha Steaks' evidence. According to Petersen's trial testimony, she regularly lifted weights in excess of the 30 to 40 pounds set forth in the Omaha Steaks' job description for the freezer assembler position. A witness for Omaha Steaks testified that the official job description (which included requirements of "maximum occasional lift force of 40 lbs. floor to waist, and frequent lift force of 30 lbs. floor to 72 [inches]") accurately reflected the job requirements, and that employees were expected to perform their work as outlined in the job descriptions.

Although Petersen performed various tasks in the freezer area during her employment with Omaha Steaks, she worked exclusively as a "runner" from December 1, 2017, until about Christmas. Runners have a radio on which they receive calls from order assemblers, and they bring missing products (such as boxes of hotdogs, hamburgers, or other frozen items sold by Omaha

Steaks) to the assemblers. Runners usually carry more than one item, but they use carts or dollies to deliver heavier amounts of missing products to order assemblers.

The trial court asked Peterson various questions during her testimony. When the court asked how she believed she injured her neck while working at Omaha Steaks, Petersen responded, "So that's something that I just came up with the answer to just recently," telling the court that it was "undeniable" that her neck was injured at Omaha Steaks. She mentioned that she was "in the best physical condition," "doing yoga," and "spiritually sound," but that after "getting carpal tunnel and . . . all of the stress . . . out of nowhere [she] just started getting hurt . . . feeling sick all of the time." Petersen continued, "Now, that's not abnormal to me, but how did it happen? It's from lifting overhead weight." According to Petersen, overhead lifting was required in all the tasks she performed at Omaha Steaks and was worse for her because she was short. She also attributed her injury to constantly having to look up 150 times a day as a spotter for the forklift operator to make sure the operator did not run into anything. With respect to her elbow injury, Petersen told the court it was caused by the repetitive movements of her job duties "without a doubt," stating that this cause was "clear right from the bat." When questioned further about what aspect of her job duties caused the elbow injury, Petersen discussed "pulling sheets and doing cleanup," performing work with her left arm, and using her left thumb to access radio calls.

With respect to Petersen's neck injury, the record contains an Omaha Steaks Immediate Response Information Form dated December 4, 2017, and amended by Petersen on December 10. The form notes Petersen's initial statement that she had been "extremely sick, bird flu" and was "experiencing soreness in back of neck/side of neck." The form also reports that Petersen's neck "bothered" her on December 3 also but that she "figured" it was "due to being sick" and that she "just feels sore and is tight." Petersen was advised to keep Omaha Steaks updated and to contact the occupational health nurse if the pain worsened. An additional note on the form added by Petersen on December 10 states, "I was unable to turn my head to look over shoulder to change lanes while driving on the way in to work that day but was unsure if the pain was due to injury from increased hours or associated wit[h] the illnesses I had been recently experiencing i.e. sinus infections or 'flu.'" On December 10, Petersen reported that her neck was still sore, and the safety specialist filled out an incident report, documenting the information previously provided by Petersen. The safety specialist asked Petersen to make any amendments or additions to the form she felt were needed, and Petersen changed the location of the accident (which the safety specialist had marked as not having occurred on the employer's premises) by writing "unsure." Another box on the form asked what object or substance directly harmed the employee. Based on Petersen's earlier response, the safety specialist had written "due to being sick." Petersen supplemented this response by adding "/unsure." And, on an Investigation Report form dated December 10, 2017, Petersen supplemented the earlier language explaining the cause of the accident as sickness by stating, "Noticed neck pain still there on Saturday 12/9 even when not feeling illness symptoms. Neck pain very bad on 12/10 but illness symptoms increasingly worsening."

The record contains additional notes made by Omaha Steaks plant nurses referencing Petersen's neck pain. A note from October 11, 2017, documents Petersen's complaint of neck pain and reflects that Petersen had been sick for about 10 days and believed that her pain "is related to her being sick." Petersen told the nurse that she kept experiencing pain in her neck "due to the

constant coughing" and that she was "feeling body aches all the way down her spine and into her hips due to stretching so much to try and stay on top of her physical therapy regimen and the flu." A nurse's note from December 10 addressed Petersen's neck pain, noting "E[mploye]e states she is not able to pinpoint any specific activity that may cause her the neck pain and verbalized repeatedly this is probably due to my sinus infection or flu like symptoms." The note from that date also observed, "E[mploye]e talked constantly and gave different statements contradicting herself."

Petersen's behavior is also documented in a nurse's note from December 6, 2017, which reflects a telephone conversation between an Omaha Steaks plant nurse and Petersen regarding an overtime work restriction imposed by Dr. Nicholas Bruggeman for Peterson's carpal tunnel syndrome. According to the note, Petersen was "very upset" about the restriction. The nurse noted that after she requested 5 minutes to speak with Petersen about the matter, "E[mploye]e kept talking and indicated I wanted to stick it to her last night and I did not know who I was 'fucking' with." The nurse also noted that when she attempted to speak further with Petersen, "E[mploye]e was very upset and hung up on me."

Petersen's claimed left elbow injury is documented in an Accident/Incident report dated December 23, 2017. The safety specialist noted Petersen's statement that "soreness/pain to elbow started yesterday 12/22" and that "no specific incident happened to make it hurt." The safety specialist also noted Petersen's statement that she "has not used it as much/tries to stay away from using it" and "states feels a lot better now than yesterday." The appended investigation report states with respect to what caused the accident, "no specific incident" and "when straightened it hurts worse." An Omaha Steaks nurse's note from December 23 documents Petersen's negative response when asked if she had injured her elbow and statement that she "is 40 and just falling apart." The note from December 23 also documents Petersen's statement that she had been sick, that the days were "running together," and that she was "not really sure about anything."

The medical records from Petersen's personal doctor, Dr. Jennifer Liu, document some evidence of Petersen's neck and elbow pain (and/or complaints of illness), but also reveal difficulties in the doctor-patient relationship and do little to clarify the cause of Petersen's pain. An Omaha Steaks Return to Work Evaluation form, signed by Liu and dated December 12, 2017, lists the reason for the referral as "Personal Illness Neck Pain Cause Unknown" and released Petersen to return to regular duty. A December 29 progress note in Liu's records reflected Petersen's visit after a diagnosis of influenza earlier in the week. Liu's physical examination of Petersen was "[n]egative for joint swelling and neck pain" and revealed a normal range of motion in her neck. Liu's January 8, 2018, progress note reflects Petersen's complaints of left elbow pain, which Petersen reported as having started a few weeks prior and which she attributed to her work. Upon examination, Liu noted some tenderness but "normal range of motion, no swelling, no effusion, no deformity and no laceration." Liu assessed a likely "combination of medial and lateral epicondylitis." On January 12, Petersen presented with continued neck pain. Liu's examination of Petersen's neck noted, "Normal range of motion. Neck supple. Muscular tenderness present. No spinous process tenderness present. No neck rigidity. No edema and normal range of motion present." Liu also noted that Petersen still had "her tennis elbow."

Liu's notes reflect that Peterson often requested certain documentation and would threaten medical staff if it was not provided to her. For example, on January 25, 2018, Liu's notes summarize the following encounter:

> Earlier today, P. Ellis requested I speak with patient . . . Petersen . . . who was at the front desk very upset. P. Ellis stated [Petersen] was demanding a return to work note. P. Ellis stated . . . Liu printed off a return to work note generated on 01/11/2018 but [Petersen] did not accept it stating it had to be for today specifically. Dr. Liu then generated a return to work note for the patient and signed it. It was given to the patient. P. Ellis stated patient then got very upset about it not including restrictions and she wanted original forms she stated she had brought in on Monday for . . . Liu to fill out.

Liu then spoke with Petersen directly and Liu's notes reflect Petersen's continued agitation and demands. Liu's notes from February 20, 21, 23, and 26 reflect further demands from Peterson with respect to forms she wanted, what Petersen wanted the forms to say, her "inconsiderate and disparaging behavior" toward Liu's staff, and her threats against Liu's medical license.

Liu's notes also reflect Petersen's dissatisfaction with other medical providers. Liu's note from March 15, 2018, addresses Petersen's request to see "a different upper extremity provider as she was dissatisfied with previous visit with Dr. Firestone." (Liu referred Petersen to Firestone, an orthopedic surgeon, in January for a possible elbow injection; Firestone declined to give an injection without taking x rays of the elbow first, and Petersen walked out of his office). Petersen was not receptive when Liu's staff explained that they "do not switch patient from provider to provider of the 'same specialty' without approval of the providers." After explaining that they would call her back to schedule an appointment if authorized after checking "with the physicians," Petersen declined to speak with Liu, when offered that option, and hung up, stating that she would "go to Bergan to get her care." Petersen expressed her dissatisfaction with the referral to Firestone again on March 21, and notes from Liu's nurse on that date state, "Patient became upset because she 'wanted to prove that no one would care for her.'" When the nurse asked why she needed proof, Petersen stated, "because there is going to be a big lawsuit because Dr. Firestone is being unethical with his care because he is refusing to care for her" and preventing other doctors from doing so, which Petersen felt was an "unethical practice." In further conversation, the nurse explained that Firestone had not wanted to continue his care of Petersen due to her noncompliance with his treatment recommendations, that another doctor would have recommended the same treatment plan, and that a third doctor had declined to see Petersen because he specialized in the care of shoulders. On March 27, Liu's office notes document a telephone encounter during which Petersen demanded a note from Liu and specified what she wanted the note to say, apparently dissatisfied with the wording of the note "written for unemployment" she had obtained from Liu the previous day.

The only medical opinions received at trial addressing the causation of Petersen's neck and left elbow injuries were letters from Liu, both dated June 27, 2019. Liu's causation opinion with respect to Petersen's neck injury states:

> [Petersen] has been under our medical care since December 2017. She has been seen multiple times for her neck pain. We have ordered EMG testing and MRIs and EMG testing

- 5 -

[sic] and prescribed multiple modalities for her pain. Her symptoms began after starting her job with Omaha Steaks and progressively continued to worsen while she was working there. In my medical opinion, her neck pain is due to her work and we have been treating it as a work comp injury.

The letter addressing Petersen's "elbow pain, left worse than right," employed identical language, including repetition of the phrase "EMG testing," although the second letter did not reference a progressive worsening of the elbow pain. Again, Liu attributed Petersen's elbow pain "to her work" and stated that her office had "been treating it as a work comp injury."

Omaha Steaks offered a medical opinion that Petersen's neck and left elbow injuries were not work related. Dr. Mark Shirley examined Petersen on behalf of Omaha Steaks on April 24, 2018. In addition to interviewing and examining Petersen, Shirley reviewed numerous medical records relevant to a determination of the "nature, extent, and current status" of Petersen's injuries. Petersen did not complete and return questionnaires pertaining to her injuries provided by Shirley's office, despite several phone call reminders. In his comprehensive report, Shirley opined that "Petersen's neck complaints are unrelated to an alleged work injury on 4 December 2017 but are rather related to a preexisting and personal health condition." He also stated his opinion that "Petersen's left elbow complaints are unrelated to an alleged work injury on 22 December 2017." As with Liu's and Bruggeman's records, Shirley's report reveals "agitated and threatening behavior" by Peterson in interacting with Shirley's office staff following his examination of her.

On December 4, 2019, the compensation court entered an award, finding that Petersen suffered bilateral carpal tunnel syndrome on August 28, 2017, in an accident arising out of and in the course of her employment with Omaha Steaks. It determined her average weekly wage at that time for purposes of both temporary and permanent disability and ordered Omaha Steaks to pay temporary total and permanent partial disability benefits, mileage, and penalties for that injury as specified in the award. The court found Petersen was not entitled to an award of future medical care for her bilateral carpal tunnel syndrome or for payment of any of the medical bills offered into evidence. Finally, the court dismissed Petersen's claims for the injuries to her neck and left elbow with prejudice.

In determining that Petersen did not injure her neck or left elbow as a result of her repetitive and allegedly heavy job duties, the court reviewed the trial evidence, including Liu's causation opinions. The court found that Liu's causation opinions with respect to the neck and elbow injuries, the only medical opinions linking Petersen's alleged neck and elbow injuries to her work at Omaha Steaks, unpersuasive and lacking in foundation. The court noted various factual inconsistencies in the record. The court stated that it was "troubled by" certain of Petersen's telephone interactions with Liu's office, which undermined Petersen's credibility as well as the credibility of Liu's reports relating the neck and elbow injuries. We address further findings by the court as necessary in the analysis section below.

ASSIGNMENT OF ERROR

Petersen asserts, consolidated and restated, that the compensation court erred in denying future medical care and permanent disability benefits for her neck and left elbow injuries that arose

from work accidents on December 4 and 22, 2017, respectively. To the extent that Petersen raises other issues in her brief that were not both specifically assigned as error and specifically argued, we have not addressed them. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *Webber v. Webber*, 28 Neb. App. 287, 942 N.W.2d 438 (2020).

## STANDARD OF REVIEW

Pursuant to Neb. Rev. Stat. § 48-185 (Cum. Supp. 2018), an appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Aboytes-Mosqueda v. LFA Inc.*, 306 Neb. 277, 944 N.W.2d 765 (2020).

On appellate review, the factual findings made by the trial judge of the Workers' Compensation Court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Id.* In testing the sufficiency of the evidence to support the findings of fact in a workers' compensation case, an appellate court considers the evidence in the light most favorable to the successful party, every controverted fact must be resolved in favor of the successful party, and the appellate court gives the successful party the benefit of every inference reasonably deducible from the evidence. *Id.*

As the trier of fact, the Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Id.*

## ANALYSIS

Petersen asserts, consolidated and restated, that the compensation court erred in denying future medical care and permanent disability benefits for her neck and left elbow injuries that arose from work accidents on December 4 and 22, 2017, respectively.

The only medical evidence in the record supporting the causation of Petersen's neck and left elbow injuries were the opinions provided by Liu. Both of Liu's causation opinions state that Petersen's symptoms started after she began work for Omaha Steaks, and then go on to state that her neck pain and elbow pain are due to her work. However, as noted by the compensation court, correlation does not equal causation. The mere fact that one may become ill or experience pain during employment does not in and of itself prove that the employee is disabled as a result of an accident arising out of and in the course of employment, entitling the individual to compensation under the Workers' Compensation Act. *Catlin v. Prairie Marketing*, 239 Neb. 363, 476 N.W.2d 234 (1991).

In order to recover under the Nebraska Workers' Compensation Act, a claimant has the burden of proving by a preponderance of the evidence that an accident or occupational disease arising out of and occurring in the course of employment proximately caused an injury which resulted in disability compensable under the act. *Hintz v. Farmers Co-op Assn.*, 297 Neb. 903, 902 N.W.2d 131 (2017). Whether an injury arose out of and in the course of employment must be

determined from the facts of each case. *Murphy v. City of Grand Island*, 274 Neb. 670, 742 N.W.2d 506 (2007).

If the nature and effect of a claimant's injury are not plainly apparent, then the claimant must provide expert medical testimony showing a causal connection between the injury and the claimed disability. *Hintz v. Farmers Co-op Assn., supra*. Triers of fact are not required to take the opinions of experts as binding on them. *Id.* It is the role of the Nebraska Workers' Compensation Court as the trier of fact to determine which, if any, expert witnesses to believe. *Id.*

Here, the trial court rejected Liu's opinions with respect to the causation of Petersen's neck and left elbow injuries, finding them not credible and lacking factual bases for Liu's opinions. The court noted Workers' Compensation Court rule 10, which requires that signed narrative reports include the relevant "history, diagnosis, findings and conclusions" of the medical expert. See Workers' Comp. Ct. R. of Proc. 10 (2020). Because there was no history contained in these reports by Liu, the court was unable to determine the bases for Liu's conclusions. The court noted various conflicting histories in the record for the cause of Petersen's neck and left elbow injuries and was unpersuaded by Liu's opinions. The court also noted the evidence in the record of Petersen's aggressive efforts to obtain various documents from her medical providers that were worded to her liking. The court found both Liu's opinions and Petersen's testimony with respect to the causation of these two injuries lacking in credibility.

Petersen complains that the trial court accepted opinion letters from the doctors who treated and evaluated her carpal tunnel syndrome, while rejecting letter opinions with respect to her neck and elbow injuries, after having informed her at a pretrial proceeding that live testimony was not needed. However, the causation opinions in the record with respect to Petersen's carpal tunnel syndrome contain elements lacking from Liu's causation opinions. Bruggeman provided an October 2017 letter detailing his evaluation of Petersen, the history of her symptoms, details of her work at Omaha Steaks, her lack of a prior history of relevant symptoms, and his diagnosis of bilateral carpal tunnel syndrome, which based on her history and his examination, he believed to be work-related. An opinion from another doctor also attributed Petersen's carpal tunnel syndrome to her work based on the timing of her symptoms after the start of her work at Omaha Steaks, the repetitive use of her hands at work, and the fact that she had no other identifiable risk factors. Such information is lacking in Liu's causation opinions.

The compensation court is the sole judge of the credibility and weight to be given medical opinions. See *Aboytes-Mosqueda v. LFA Inc.*, 306 Neb. 277, 944 N.W.2d 765 (2020). This is true even when the health care providers do not give live testimony. See *Gardner v. International Paper Destr. & Recycl.*, 291 Neb. 415, 865 N.W.2d 371 (2015). Here the record did not reveal upon what facts Liu based her causation opinions, and the compensation court did not err in rejecting them. The value of an opinion of an expert is no stronger than the facts upon which it is based. See *Hintz v. Farmers Co-op Assn.*, 297 Neb. 903, 902 N.W.2d 131 (2017). And, an expert must-have a factual basis for her opinions. See *Michie v. Anderson Builders*, 22 Neb. App. 731, 859 N.W.2d 906 (2015). Without Liu's opinions, there was no expert medical testimony showing a causal connection between Petersen's neck and elbow injuries and her claimed disability. The court did not err in dismissing Petersen's claims with respect to those two injuries.

## CONCLUSION

The compensation court did not err in dismissing Petersen's claims for disability benefits and future medical care with respect to her neck and left elbow injuries.

AFFIRMED.